ATTORNEYS FOR APPELLANT
Jay A. Rigdon
Adam D. Turner
Rockhill Pinnick LLP
Warsaw, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Arturo Rodriguez II
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court

FILED

Sep 29 2010, 1:41 pm

CLERK
of the supreme court,
court of appeals and
tax court

No. 25S04-1004-CR-219

JAMES A. CARR,                                             *Appellant (Defendant below),*

v.

STATE OF INDIANA,                                     *Appellee (Plaintiff below).*

Appeal from the Fulton Superior Court, No. 25D01-0611-MR-277
The Honorable Wayne E. Steele, Judge

On Transfer from the Indiana Court of Appeals, No. 25A04-0906-CR-356

**September 29, 2010**

**Dickson, Justice.**

Appealing his conviction for Murder,[1] the defendant alleges four errors: (1) denial of his motion for discharge under Indiana Criminal Rule 4; (2) admission of his statement to a police detective despite his repeated invocation of his right to counsel; (3) limitations on defense questioning of the police detective; and (4) refusal of tendered instructions regarding lesser included offenses. The Court of Appeals affirmed in a memorandum decision. We granted transfer and now reverse and remand for new trial.

---

[1] Ind. Code § 35-42-1-1.

The defendant was convicted following a jury trial for the November 4, 2006, murder of Roy Allen Shaffer at Kewanna, Fulton County, Indiana. The killing occurred when the defendant fired his shotgun directly into the victim's face during an argument between the two men. The defendant then drove to a bar in Monterey, Indiana, and admitted the killing to the bartender, stating, "I shot Allen [Shaffer] . . . he wouldn't tell me the truth and I just, I just shot him," Tr. at 324, and "I pulled the trigger," *id.* at 326. The defendant, while in police custody, further described the incident during an ensuing videotaped police interview the day after the crime.

## 1. Denial of Motion for Discharge for Delay under Criminal Rule 4

The defendant first contends that the trial court erred in denying his February 4, 2009, motion for discharge pursuant to Indiana Criminal Rule 4(C). He argues that, because two of his continuance requests should have "been properly attributed to the State," he was not brought to trial within one year as required by the Rule. Appellant's Br. at 13. In relevant part, the Rule provides:

> **(C) Defendant Discharged.** No person shall be held on recognizance or otherwise to answer a criminal charge for a period in aggregate embracing more than one year from the date the criminal charge against such defendant is filed, or from the date of his arrest on such charge, whichever is later; *except where a continuance was had on his motion, or the delay was caused by his act*, or where there was not sufficient time to try him during such period because of congestion of the court calendar; provided, however, that in the last-mentioned circumstance, the prosecuting attorney shall file a timely motion for continuance . . . . Any continuance granted due to a congested calendar or emergency shall be reduced to an order, which order shall also set the case for trial within a reasonable time. Any defendant so held shall, on motion, be discharged.
>     \*    \*    \*
> **(F) Time periods extended.** When a continuance is had on motion of the defendant, or delay in trial is caused by his act, any time limitation contained in this rule shall be extended by *the amount of the resulting period of such delay caused thereby*.

Ind. Crim. R. 4(C) and (F) (emphasis added). Neither party makes any claim of court congestion as a factor in this case.

We first observe that the defendant incorrectly refers to whether delay should be attributed to the State. It has not been uncommon for lawyers and courts to address Rule 4 claims in part by considering whether delay should be "chargeable to the State," but the role of the State is

an irrelevant consideration in the analysis. The Rule does not call for any attribution of delay to the State but only for delay attributable to the defendant or insufficient time due to court congestion or emergency. To resolve a motion for discharge made under Rule 4(C), it is necessary to identify only those delays attributable to the defendant and those attributable to court congestion or emergency. For purposes of Criminal Rule 4 evaluations, the phrase "chargeable to the State" is an unfortunate misnomer, inexact, and potentially misleading. No purpose is served by devoting time and effort to evaluate whether a delay is "chargeable to the State." The Rule does not involve assessment or attribution of any fault or accountability on the part of the State, but generally imposes upon the justice system the obligation to bring a defendant to trial within a set time period, which is extended by the amount of delay caused by the defendant or under the exception for court calendar congestion or emergency. Employing the rhetoric of "delay chargeable to the State" should be avoided.

Rephrased accordingly, the essence of the defendant's claim here is that the delays caused by two of his continuance motions should not be used to extend the one-year period within which the justice system was required to bring him to trial. He asserts that his August 8, 2007, and November 7, 2007, motions for continuance were necessitated by the State's untimely response to the defendant's request for the autopsy report and the results of firearm testing, and any delay attributable to such motions should not be used to extend the one-year deadline for bringing him to trial. When a trial court grants a defendant's motion for continuance because of the State's failure to comply with the defendant's discovery requests, the resulting delay is not chargeable to the defendant. Isaacs v. State, 673 N.E.2d 757, 762 (Ind. 1996).

The defendant's August 8, 2007, motion to continue the trial date initially requested that the resulting delay be "charged to the state," in effect a request that the delay not be charged to the defendant. At the ensuing hearing on August 8, counsel for the defendant said that, "[t]his is our continuance and therefore the delay [should] be charged to the defendant." Tr. at 54. The trial court rescheduled the trial from August 20, 2007, to January 22, 2008, but expressly noted the defendant's request for delay "Charged to the State withdrawn." Chronological Case Summary (CCS), Appellant's App'x at 5. This continuance motion resulted in a 170-day delay in the scheduled trial date, but in light of the defendant's own declaration, it is properly attributed to the

defendant.

On November 7, 2007, the CCS reflects that on motion of the defendant the jury trial was reset from January 22, 2008, to May 6, 2008. This resulted in a 105-day delay in the trial date. The defendant argues that this motion was made "because he had not received certain firearm testing evidence," Appellant's Br. at 11, but this claim is not supported by the record as presented in the CCS and transcript. The reasons given in support of the oral motion instead were the defense counsel's own scheduling conflict and his need for more time to employ and work with a forensic pathologist. Tr. at 62.

The defendant's appellate claim of error in denying his motion for discharge is predicated upon his assertion that these two continuances should not have been charged to the defendant. Rejecting this claim, we find no error in the trial court's decision to charge both delays to the defendant and thus to deny the defendant's motion for discharge under Criminal Rule 4(C).

## 2. Admission of Custodial Statement Made After Invoking Right to Counsel

The defendant next contends that his custodial statements made during his videotaped interview by police the morning after the crime were improperly admitted into evidence. He asserts that he repeatedly and unequivocally invoked his right to counsel and did not thereafter waive this right. But police ignored his requests and continued the interrogation, resulting in the defendant providing statements that he alleges were a key element in the State's case. The defendant asserts that the admission of the interview evidence violated his right to counsel.[2] The State responds that the defendant's requests for an attorney were equivocal and ambiguous and, if not, that any resulting error was harmless.

As established in Miranda v. Arizona, prior to any questioning of a person taken into cus-

---

[2] While generally averring a violation of his right to counsel under both the federal and state constitutions, the defendant's citations to authority are based on federal jurisprudence. He does not present any argument contending that the right to counsel provided under the Indiana Constitution differs from that provided under the United States Constitution. We therefore consider his claim only under federal constitutional jurisprudence.

4

tody, "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694, 706–07 (1966). If the accused requests counsel, "the interrogation must cease until an attorney is present." Edwards v. Arizona, 451 U.S. 477, 482, 101 S. Ct. 1880, 1883, 68 L. Ed. 2d 378, 384 (1981) (quoting Miranda, 384 U.S. at 474, 86 S. Ct. at 1628, 16 L. Ed. 2d at 723). An accused's request for counsel, however, must be unambiguous and unequivocal. Berghuis v. Thompkins, 560 U.S. ___, ___, 130 S. Ct. 2250, 2259, 176 L. Ed. 2d. 1098, 1110 (2010). The cessation of police questioning is not required "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel." Davis v. United States, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355, 129 L. Ed. 2d 362, 371 (1994). An accused may waive the right to counsel, if done voluntarily, knowingly, and intelligently. Miranda, 384 U.S. at 444, 86 S. Ct. at 1612, 16 L. Ed. 2d at 707. A waiver that comes from "the authorities' behest, and not at the suspect's own instigation . . . [is] not the purely voluntary choice of the suspect." Maryland v. Shatzer, 559 U.S. ___, ___, 130 S. Ct. 1213, 1219, 175 L. Ed. 2d 1045, 1053 (2010) (quoting Arizona v. Roberson, 486 U.S. 675, 681, 108 S. Ct. 2093, 2097–98, 100 L. Ed. 2d 704, 713 (1988)). As recently expressed in Shatzer:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [He] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

559 U.S. at ___, 130 S. Ct. at 1219, 175 L. Ed. 2d at 1053 (quoting Edwards, 451 U.S. at 484–85, 101 S. Ct. at 1884–85, 68 L. Ed. 2d at 386). Even if an accused elects to waive his rights, such waiver may later be rescinded at any time, and "[i]f the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease." Berghuis, 560 U.S. at ___, 130 S. Ct. at 2263–64, 176 L. Ed. 2d at 1115.

Following his arrest on the evening of the crime, the defendant was questioned at the police station by Detective Daniel Pryor of the Fulton County Sheriff's Department. The following excerpts pertinent to the claimed violation of his right to counsel are taken from the interview:

5

[After a quick exchange of pleasantries between the defendant and Detective Pryor, the defendant stated]: Mr. Pryor I want to be cooperative . . . but at the same point *I'm in a situation where I feel like . . . I really need an attorney to . . . talk with, and for me*. [Emphasis added.]

[Detective]: Well, and you're absolutely entitled to that sir. . . . I'm not going to violate your rights (inaudible) that way. The only reason I was in here, we know what happened, that's not why I was in here, I just wanted to know why. It might not be as bad as it appears, but only you know those circumstances, but you're entitled to an attorney and I'm not going to.

[Defendant]: Yeah, OK. Well I mean *ask me, ask me what you want to ask me*. [Emphasis added.]

[Detective]: Well I mean that's up to you. . . . I have to read you your rights because you're in custody (inaudible) . . . I want to do things by the book. . . . Like I said, things look bad but they're not always as they look.

Appellant's App'x at 389.

[Defendant]: Well, believe me it's bad, you know what I mean? It's bad.

[Detective]: Well, . . . I won't lie to you Jim, it doesn't look good. But like I say, it may look worse than what it actually is. That's why I'm here in fairness.

    *   *   *

*Id.* at 390.

[Shortly thereafter, the detective advised the defendant of his rights to remain silent and to counsel before making any statement or answering any questions, including his right to appointed counsel, and the defendant acknowledged understanding them.]

[Detective]: Like I said Jim things looks bad I won't lie to you based on what it looks like it looks like murder. Ok? It may not be that. There's different degrees of things. Ok? Like I say only person that knows the circumstances as to why things happened would be yourself.

*Id.* at 391–92.

    *   *   *

 [Detective]: . . . I'm straight with you, I'm straight with anybody I talk to. What good

does bs-ing people do, nothing.  This isn't a game.

[Defendant]: And I know it's not a game I mean I understand what's happened and that's why, that's why I feel as though, you now, *I need to have an attorney to deal with because this is a serious thing*, you know, it's a very serious thing, I know it's a very serious thing.  [Emphasis added.]

[Detective]: Yes sir I understand.  And I won't question you. -- I'm just throwing this out here and you've asked for an attorney and you're entitled to it.

*Id.* at 392.

[The defendant then asks for a cigarette, and the detective provides one.]

[Detective]: Those aren't meant to get you to talk to me. . . . I'm a smoker.  My point, my point is this -- there's a difference between murder, something that murder kind of embodies, someone planned something and then there's lesser degrees of that so.

[Defendant]: I'll just tell you straight out that there was no plan.  No plan whatsoever -- none.  And I -- The weapon that was used is a uh -- are we on, we're on camera?  Right?

\* \* \*

[Detective]: . . . [Y]ou said something about a lawyer I don't want to . . . you have the right to tell me you don't want that but I don't want to.

[Defendant]: Well I want, *I want to tell you* that it was not a planned situation. . . . And uh the weapon that was used is my gun.  And uh, [Allen] had, had -- he's been stealing things from me for quite some time. . . . All I'm telling you is that it was not a planned thing. . . . we were angry -- well I was angry with him I don't know if he was angry with me or not I have no idea so -- other than that I got, really I just feel like in this situation as serious as it is that *I need to consult an attorney before I say anything more*.  [Emphasis added.]

[Detective]: And I respect that and it's your right.  Part of what you just told me you wanted to tell me without the lawyer?

[Defendant]: Right, exactly.

*Id.* at 393.

\* \* \*

[Detective]: You wanted to tell me that without the lawyer.  I didn't . . . [c]oerce you in any way, I want to be fair to both.

7

[Defendant]: Other than that, just that the weapon was provided, it was not, you know, I did not bring it with me -- I did not think about -- I had no thoughts of [it] whatsoever.

[Detective]: That's all you're comfortable with talking about [it] now?

[Defendant]: Right now, yeah. Do you have any idea *how long it will be before I can see an attorney?* [Emphasis added.]

[Detective]: [T]he jailor will be able to help you with that. I mean you're entitled to a phone call you're entitled to those things and like I said I respect your constitutional rights and we won't go any further as far as interviewing or asking questions.

\* \* \*

[Detective]: That's where we're at right now if that's OK. We'll go from there, and uh, just relax smoke your cigarette -- sit here tight and we'll figure out what's going on. . . . You're entitled to a phone call once you get -- .

*Id.* at 394.

[Defendant]: Now, you know I've watched enough LAPD and Blue and all that kind of stuff. Now if we do talk I mean what happens? I mean I don't want to 'lawyer up' as they say, you know. I mean, I just like I say this is a serious thing, you know it's a serious thing.

[Detective]: Yes we both know that, we're both grown adults. . . . There's no place to BS. . . . I mean you're curious as to what would happen if you wanted to talk? But then again you have to voluntarily make that decision I don't want to coerce you in any way to make any decisions.

[Defendant]: Well why don't we do it this way. *Go ahead and ask me questions and if I feel comfortable telling you I will tell you.* You know. [Emphasis added.]

[Detective]: Ok. That's fair enough. You're freely saying that you don't want a lawyer right now, you're willing --

[Defendant]: *I'm willing to answer questions, you know, up to a point* I suppose. You know. [Emphasis added.]

[Detective]: . . . like I said its apparent what happened here. The man was shot. . . . [a]t that house. Where the activity took place? [question mark in transcript] . . . If, if you're willing to share with me I guess -- I'll put it this way, would it be easier for you, would it be easier for you if you, just tell me with what you're comfortable, what you're willing to tell me and we'll leave it at that right now. Would that, would that be easier Jim?

[Defendant]: Well Dan I'm not sure. You know, I mean, I want to be cooperative with

8

you -- but, you know, as I said earlier I'm in a serious situation.

Appellant's App'x at 395.

> [Detective]: Right.  I understand.  I mean what I was thinking it might be easier because you know the things that you're willing to answer.  Maybe you could just -- if it would be easier for you and me to just tell me that information and then whatever you're comfortable with.

*Id.* at 395–96.  At that point, the defendant provided a detailed explanation of the crime, concluding, "and so and um -- I picked up the gun and I was holding it.  At one point I cocked it and looked at it and he said 'do it, do it, do it, do it' and not the first time or the second time or the third time one of those times -- finally, I did it."  *Id.* at 396.  The detective then expressed sympathy to the defendant for his stressful personal situation, and the interview continued.

> \* \* \*
>
> [Detective]: Sounds like there's a lot there.
>
> [Defendant]: Seriously . . . Go ahead and ask me questions . . . I mean *I'll waive the attorney right and I'll just go ahead and talk with you about thi*s because of (inaudible). [Emphasis added.]
>
> [Detective]: Well listening to you I don't want to put words in your mouth and you stop me if I do that -- I want this to be accurate.

*Id.* at 398.  This was the last reference relating to the defendant's request for counsel.  The interview continued with the defendant providing considerable additional information about the details of the crime.

Detective Pryor's interrogation style was neither threatening nor intimidating.  Instead, he was respectful, considerate, and courteous during the interview.  The detective's technique may have had the effect of ingratiating himself with the defendant and putting the defendant at ease, thus eliciting the defendant's willingness to provide a statement.  Whether a product of the detective's natural style or a calculated technique, such an interrogation style is not inherently coercive because it does not threaten, cause injury, or evoke fear.  "[T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'"  Berghuis, 560 U.S. at ___, 130 S. Ct. at 2263, 176 L. Ed. 2d at 1114

9

(quoting Colorado v. Connelly, 479 U.S. 157, 170, 107 S. Ct. 515, 523, 93 L. Ed. 2d 473, 486 (1986) (quoting Oregon v. Elstad, 470 U.S. 298, 305, 105 S. Ct. 1285, 1290, 84 L. Ed. 2d 222, 229 (1985))).

Nevertheless, we find several instances when the defendant's right to counsel was violated during his interrogation. These relate primarily to the detective's usual response, when confronted with the defendant's invocation of his right to counsel, to acknowledge the request but then to keep the conversation going.

The defendant's right to counsel was first violated at the beginning of the interview when the defendant stated, "I'm in a situation where I feel like . . . I really need an attorney to . . . talk with, and for me." Appellant's App'x at 389. This was an unequivocal and unambiguous invocation of his right to counsel. The detective understood this and acknowledged, "you're absolutely entitled to that sir. . . . I'm not going to violate your rights (inaudible) that way." *Id.* But the detective did not cease further interrogation but nevertheless continued by inviting the defendant to talk more, adding, "The only reason I was in here, we know what happened, that's not why I was in here, I just wanted to know why. It might not be as bad as it appears, but only you know those circumstances, but you're entitled to an attorney." *Id.* This precipitated the defendant to respond, "Yeah, OK. Well I mean ask me, ask me what you want to ask me." *Id.* This statement does not constitute a valid waiver of the defendant's right to counsel for two reasons. First, the detective's failure to immediately cease all questioning until the defendant's attorney was present was in violation of Edwards, 451 U.S. at 482, 101 S. Ct. at 1883, 68 L. Ed. 2d at 384. Once the defendant stated, "I really need an attorney," Appellant's App'x at 389, the defendant's right to counsel should have been "scrupulously honored." Miranda, 384 U.S. at 479, 86 S. Ct. at 1630, 16 L. Ed. 2d at 726. Instead, the detective's ongoing conversation initiated further custodial interrogation, and the defendant's subsequent disclosures were not a product of his own initiation of communication. Pursuant to Shatzer, Roberson, and Edwards, the defendant did not voluntarily waive his right to counsel. Second, when this exchange occurred, the detective had not yet informed the defendant of his Miranda rights. "No effective waiver of the right to counsel during interrogation can be recognized unless specifically made after the warnings we here delineate have been given." Miranda, 384 U.S. at 470, 86 S. Ct. at 1626, 16 L. Ed. 2d at 721.

10

The defendant's next invocation of his right to counsel was similarly disregarded. When he declared, "I need to have an attorney to deal with because this is a serious thing," Appellant's App'x at 392, the detective immediately acknowledged that the defendant had "asked for an attorney and you're entitled to it," *id.*, but nevertheless continued the interview by telling the defendant while a planned killing may be a murder, there are "lesser degrees." *Id*. at 393. This statement, in the nature of an open-ended invitation encouraging further communication from the defendant notwithstanding his second unambiguous and unequivocal invocation of his right to counsel, succeeded in persuading the defendant to admit that "there was no plan," and he was angry at the victim, and that "the weapon that was used is my gun." *Id*. Even if we consider only this second invocation of the right to counsel, because the defendant's resulting incriminating statements were the product of communications initiated not by him but by police, no valid waiver existed.

As soon as the defendant made these responses, he again declared, "I just feel like, in this situation as serious as it is, that I need to consult an attorney before I say anything more." *Id.* Again, the detective responded by acknowledging the defendant's right to counsel but sought to obtain a waiver of the right from the defendant, asking him, "Part of what you just told me you wanted to tell me without the lawyer?" to which the defendant replied, "Right, exactly." *Id.* In the ensuing colloquy, the detective repeatedly sought and obtained the defendant's confirmation that he had "wanted to tell me that without the lawyer," and that he was not coerced "in any way," and that he was "comfortable with talking about [it] now." Appellant's App'x at 394. This attempt by the detective to establish the defendant's waiver of his unambiguous invocation of the right to counsel is not permitted under <u>Shatzer</u>, <u>Roberson</u>, and <u>Edwards</u>. The defendant's purported waiver was a result of the detective's failure to scrupulously honor the defendant's invocation of his right to counsel and was the result of police instigation, not further communication voluntarily initiated by the defendant.

Immediately after this exchange, the defendant again invoked his right to counsel—now for a fourth time—stating, "Do you have any idea how long it will be before I can see an attorney?" *Id.* The detective again acknowledged the defendant's right and stated, "we won't go any

11

further as far as interviewing or asking questions." *Id.* The detective then engaged in further communication, but it does not appear intended to be evocative. Rather, it informed the defendant of the standard procedures that would be followed for the defendant to be able to telephone an attorney. When the defendant volunteered, "Now if we do talk I mean what happens? I mean I don't want to 'lawyer up' as they say, . . . like I say this is a serious thing," the detective replied, "I mean you're curious as to what would happen if you wanted to talk? But then again you have to voluntarily make that decision I don't want to coerce you in any way to make any decisions." *Id.* at 395. The defendant's subsequent statements including, "Go ahead and ask me questions and if I feel comfortable telling you I will tell you," "I'm willing to answer questions, you know, up to a point I suppose," and "Well Dan I'm not sure. You know, I mean, I want to be cooperative with you -- but, you know, as I said earlier I'm in a serious situation," *id.*, together suggest either a voluntary waiver or at least an equivocation that would serve to undermine his invocation of the right to counsel. But such purported waiver or equivocation would not have occurred had the detective scrupulously honored the defendant's unequivocal and unambiguous invocations of the right to counsel by immediately ceasing further communications with him until an attorney was present. Instead, however, the detective prolonged the conversation and thus instigated the subsequent dialogue. This pattern occurred three times. This violates the principle that

> [O]nce a suspect indicates that "he is not capable of undergoing [custodial] questioning without advice of counsel," "any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect."

Shatzer, 559 U.S. at ___, 130 S. Ct. at 1219, 175 L. Ed. 2d at 1053 (quoting Roberson, 486 U.S. at 681, 108 S. Ct. at 2097–98, 100 L. Ed. 2d at 713). In addition, the detective's persistent resumptions of communications after the defendant's invocation of rights runs afoul of Michigan v. Mosley, which warned, "To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of Miranda by allowing repeated rounds of questioning to undermine the will of the person being questioned." 423 U.S. 96, 102, 96 S. Ct. 321, 326, 46 L. Ed. 2d 313, 320 (1975). Because of the detective's failure to immediately cease further communications following the defendant's unambiguous and unequivocal invocations of his right to counsel, we cannot give credence to the defendant's subsequent apparent waiver or equivocation as to his right to counsel. As a result, the videotape and transcript of the police inter-

12

view of the defendant were erroneously admitted in evidence. *See* <u>Massiah v. United States</u>, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964); <u>Spano v. New York</u>, 360 U.S. 315, 79 S. Ct. 1202, 3 L. Ed. 2d 1265 (1959).

Not every error in the admission of evidence, however, requires a reversal. <u>Milton v. Wainwright</u>, 407 U.S. 371, 92 S. Ct. 2174, 33 L. Ed. 2d 1 (1972). And "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." <u>Chapman v. California</u>, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705, 710–11 (1967).[3] The defendant's statements during the police interview contained considerable details regarding his state of mind during the killing—details not provided by other evidence.

The State's first witness, Jan French, drove the defendant to his home from the bar he visited after the shooting. She had noticed blood on the defendant's pants. During the trip home, the defendant told her that he "was gonna go to jail," Tr. at 324, and that "I shot Allen . . . he wouldn't tell me the truth and I just, I just shot him," *id.*, and "I pulled the trigger," *id.* at 326. After dropping off the defendant, French drove to the victim's residence to determine his condition and whether to call for medical assistance but found his lifeless body with an apparent gunshot wound to the face. Testimony of forensic pathologists showed that the fatal shot was fired from close range, possibly up against the victim's face. The blood on the defendant's trousers was found to contain DNA consistent with that of the victim. The defense's single witness testified that the victim's blood alcohol level was three times the legal limit. The thrust of the defense's final argument was that both he and the victim were intoxicated and that the evidence was consistent with an accidental shooting possibly precipitated by the victim's falling forward into the gun, and thus there was insufficient evidence to establish a knowing or intentional killing.

---

[3] Notwithstanding the United States Supreme Court's holdings in <u>Chapman</u> and <u>Milton</u>, recognizing that a reversal is not required for constitutional errors if harmless beyond a reasonable doubt, at least one Indiana decision interpreting federal jurisprudence appears to suggest otherwise. <u>Propes v. State</u>, 550 N.E.2d 755, 758 (Ind. 1990) ("violation of the right to counsel is . . . reversible *per se* despite other, independent evidence sufficient to support a conviction"). To the extent that it is inconsistent with <u>Chapman</u>, this statement is incorrect.

The jury's final instructions covered two offenses, Murder and Voluntary Manslaughter.[4] The contested issue was whether the State provided sufficient evidence of the defendant's state of mind to prove Murder, a knowing or intentional killing; Voluntary Manslaughter, a knowing or intentional killing done under sudden heat; or neither.

The defendant's statements during his police interview asserted that he had befriended Roy Allen Shaffer for several months prior to the crime, arranged for Shaffer to rent a home owned by the defendant's mother, paid Shaffer's rent, found him jobs, and provided him with use of a truck. But Shaffer then took and sold various items of the defendant's personal property. The defendant was angry at Shaffer as "an individual who does not respect people or property or anything. No gratitude." Appellant's App'x at 410–11. The defendant's statements appeared to stress that the killing was not premeditated, stating that he did not have an advance plan, *id.* at 393, 397, 410; that it "was nothing I thought about doing," *id.* at 397; that it "was not an intended thing," *id.* at 399; that there was "no malice aforethought, nothing planned," *id.* at 406; and that it was "just a spur of the moment thing," Appellant's App'x at 407. The defendant also asserted that he asked Shaffer about various missing personal belongings and that both men were intoxicated at the time. The defendant described the fatal incident as follows:

> I have no idea how much money [he] has taken in -- I have no idea what he sold things for -- and so and um -- I picked up the gun and I was holding it. At one point I cocked it and looked at it and he said "do it, do it, do it, do it" and not the first time or the second time or the third time one of those times -- finally, I did it.

*Id.* at 396. Later in the interview, he said, "Well and you know like I said I had the gun and he kept saying 'do it, do it, do it, do it, do it, do it, do it, do it, do it,' and I did it." *Id.* at 405.

As to the key contested element, the defendant's state of mind at the time he fired the shotgun, the defendant's statements during the police interview did not merely supplement the

---

[4] Voluntary Manslaughter is defined by Indiana Code § 35-42-1-3, which states in pertinent part:
 (a) A person who knowingly or intentionally . . . kills another human being . . . while acting under sudden heat commits voluntary manslaughter, a Class B felony. However, the offense is a Class A felony if it is committed by means of a deadly weapon.
 (b) The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder under section 1(1) of this chapter to voluntary manslaughter.

14

earlier undisputed testimony of Jan French, to whom the defendant had admitted only pulling the trigger and shooting the victim.  The videotaped police interview shown to the jury (and pro-vided as a written transcript) provided the jury with significant additional evidence of the defen-dant's state of mind.  At the time the defendant pulled the trigger, he was angry because the vic-tim had engaged in a series of property thefts from the defendant and because the victim lacked gratitude despite the defendant's numerous acts of kindness and generosity toward the victim.  And the defendant repeatedly and vividly admitted during the police interview that "I did it" in response to a series of taunts from the victim to "do it."  Such evidence significantly amplified the proof that the defendant's killing of the victim was at least done knowingly, if not intentional-ly.  We are unable to conclude that the erroneous admission of the defendant's police interview was harmless beyond a reasonable doubt and thus requires reversal of his conviction.

The State is not, however, precluded from retrying the defendant for this offense.  A re-versal for insufficient evidence bars retrial under the Double Jeopardy Clause,[5] but an analysis for such sufficiency includes consideration of the erroneously admitted evidence.  Lockhart v. Nelson, 488 U.S. 33, 40, 109 S. Ct. 285, 290, 102 L. Ed. 2d 265, 273 (1988).  Here, although re-versal is required because of trial error in the admission of evidence, "clearly *with* that evidence, there was enough to support" the jury's verdict of guilty and the resulting conviction.  *Id.* at 40, 109 S. Ct. at 291, 102 L. Ed. 2d at 273 (emphasis in original).  *See also* Lambert v. State, 534 N.E.2d 235, 237 n.2 (Ind. 1989).  The defendant therefore may be subject to retrial.

### 3.  Limitation of Defense Examination of Detective

The defendant contends that the trial court erred when it prohibited the defense from cross-examining the detective about the defendant's level of intoxication.  The defendant argues that such questioning was relevant to the issue of the voluntariness of his police interview state-ments.  Notwithstanding our determination that the conviction must be reversed and the case re-manded for retrial, we address this issue because of the possibility that it may arise on retrial.

---

[5] "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const. amend. V, cl. 2.

The specific trial court ruling here challenged by the defendant occurred during the testimony of Detective Pryor, who was recalled as a witness by the State to facilitate its proffer of the videotaped interview into evidence. Preliminarily, the State asked the detective whether he had utilized a statement of rights form and read it to the defendant. The detective confirmed this and identified an exhibit as that document. When the State then offered the exhibit into evidence, the defense sought and received permission to voir dire the witness. During the voir dire questioning, the defense began to ask the detective about whether he "had information before you came into that room to speak with Mr. Carr about his consumption of alcohol had you not?" Tr. at 678. The State objected, stating, "this goes way beyond the admission of this Exhibit." *Id.* The defense responded that "our client was in no position to give a voluntary waiver of rights under his circumstances and I was just exploring that issue." *Id.* The trial court sustained the State's objection but told defense counsel, "you'll be given that opportunity but [not] for this particular Exhibit at this particular time." *Id.* When the State subsequently offered into evidence the actual videotape and its transcription, the defense again requested "to voir dire the witness on . . . the voluntariness of whatever statement our client may have made due to his state of intoxication." *Id.* at 680. At this point the jury was excused and the defense and the State each explored the issue with the detective without restraint, after which the defense objected to the admission of the videotape evidence "based upon the state of intoxication of our client" and sought to "renew the motion to suppress . . . based primarily upon our client's Miranda rights." *Id.* at 684–85. After extensive further argument of counsel, the defendant's objection was overruled, the jury was seated, and the videotape was presented to the jury. At no time thereafter did the defense seek to cross-examine the detective about the defendant's state of intoxication during the custodial interview. The defense did not conduct further cross-examination of the detective nor did they recall him as a defense witness.

We agree that questioning the detective about the defendant's state of intoxication during the interview generally would have been proper and permissible. The defendant's challenge, however, is to the trial court's refusal to permit voir dire examination of the detective on the issue of the admissibility of the statement of rights form. This exhibit merely identified the location of the interview, date, time, and officer's name; stated the defendant's basic <u>Miranda</u> rights; and contained the defendant's signature acknowledging "the reading and understanding of my rights

16

as they are stated above." Appellant's App'x at 413. The exhibit did not purport to constitute any waiver of the defendant's rights nor contain any other statement of the defendant. The existence and extent of the defendant's intoxication at the time the detective read him the statement of rights form is irrelevant to the admissibility of the form itself. The trial court did not err in sustaining the State's objection.

## 4. Refusal to Give Tendered Instructions on Lesser Included Offenses

The defendant contends that the trial court erroneously refused his tendered instructions that would have permitted the jury to find the defendant guilty of Involuntary Manslaughter, Criminal Recklessness, and/or Battery, as an alternative to Murder.[6] Denying the instructions, the trial court found that "there is not a serious evidentiary dispute over the element or elements that distinguish the crime charged from those lesser included." Tr. at 732. Challenging this evaluation, the defendant points to testimony that he had been drinking and to the defendant's videotaped statement to police, admitted into evidence, that the shooting was simply an unplanned impulse occurring after drinking and argument and without premeditation. Appellant's Br. at 20. To support the existence of a serious evidentiary dispute that would warrant the giving of his tendered lesser included offense instructions,[7] the defendant largely relies on evidence from his custodial police interview. Because we have determined that it should have been excluded by the trial court, this issue is not likely to reappear upon retrial and thus does not merit further discussion in this appeal.

## Conclusion

While concluding that the defendant was not entitled to discharge under Criminal Rule 4, we hold that his custodial statements, taken by police in disregard of his invocation of his right to counsel, were erroneously admitted and that such error was not harmless beyond a reasonable

---

[6] As required by Indiana Appellate Rule 46(A)(8)(e), the appellant's brief purports to set out the defendant's tendered instructions defining the lesser included offenses, but does not identify their location in the record. Our review is somewhat impeded because we do not find the actual tendered instructions in the Appellant's Appendix or in the transcript of evidence.

[7] Wright v. State, 658 N.E.2d 563, 567 (Ind. 1995).

doubt, thus requiring a reversal of the conviction and remand for retrial.

Shepard, C.J., and Sullivan, Boehm, and Rucker, JJ., concur.