## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 09 2018, 8:40 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Bruce W. Graham
Graham Law Firm P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Michael Gene Worden
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kristopher Kanable, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | August 9, 2018 <br><br> Court of Appeals Case No. 18A-CR-195 <br><br> Appeal from the Tippecanoe Superior Court <br><br> The Honorable Randy J. Williams, Judge <br><br> Trial Court Cause No. 79D01-1606-F2-14 |

**Vaidik, Chief Judge.**

# Case Summary

[1] The State charged Kristopher Kanable with nine crimes for his role in an armed home invasion and sought a sentencing enhancement based on Kanable's use of a firearm. A bench trial was held, and the trial court found Kanable guilty of all nine counts as well as the firearm enhancement. The court merged two counts into two other counts and then sentenced Kanable to an aggregate term of forty-three years.

[2] Kanable now appeals, arguing that the trial court erred in admitting the statements he made to detectives after he invoked his Fifth Amendment right to counsel and that there are a variety of problems with his multiple convictions for the home invasion. Although we find that any error in admitting Kanable's statements was harmless, we find that there are issues with Kanable's multiple convictions. We therefore order the trial court to vacate five of the convictions and reinstate one of the them. We therefore affirm in part and reverse and remand in part.

# Facts and Procedural History

[3] On Friday, May 6, 2016, four men—Kanable, Xzavier Jordan, Brenton Hoppes, and Jason White—spent the day together, first in Kokomo and then in Lafayette. Jordan drove the men around in his white SUV. While together, the men concocted a plan to take property from a house while armed with a gun.

[4]  Also on this same day, Joseph Ervin was house sitting at his in-laws' rural Tippecanoe County home while they were vacationing in Mexico. That evening, Joseph was eating dinner at the dining-room table when there was a knock at the front door. Joseph opened the door and asked the person if he could help him. The person—who was later determined to be Jordan—asked Joseph if he had any oil that he could use for his white SUV, which was pulled up to the garage. Tr. Vol. II p. 118. Curious what was going on, Joseph stepped out onto the porch. At this point, a second man—who was later determined to be Kanable—appeared from the other side of the SUV, pulled out a handgun, pointed it at Joseph, and ordered him back inside the house. Kanable and his companions—Jordan, Hoppes, and White—followed Joseph inside the house and directed him to the kitchen, where his hands were then zip-tied behind his back. Notably, Joseph kept his eyes closed throughout the entire ordeal (because he thought it would improve his chances of staying alive), but he could hear at least three distinct voices (although he thought there might have been more than three people involved).

[5]  After securing his hands, the men ordered Joseph to lie face down on the kitchen floor while they searched the house. They asked Joseph where the safe, guns, and cash were; Joseph directed them to the guns but said he didn't know about a safe and cash because it wasn't his house. After the men discovered that there was a basement, they ordered Joseph down there. Soon thereafter, one of the men saw that the zip ties around Joseph's hands were starting to fail and became agitated. Worried that he would be shot, Joseph quickly told the

men to use "better bindings" and suggested using cables from some nearby microphones, which they did. *Id.* at 81. The men then became upset when they "hadn't found what they were looking for." *Id.* at 82. When they again asked Joseph about a safe, he responded, "[W]hy would I know where the safe [i]s, I'm a cat sitter. Who tells the cat sitter, 'here is where all my most valuable things are?'" *Id.* During this time, a gun was placed to Joseph's head.

[6] The men eventually believed Joseph's claims that it wasn't his house and that he didn't know where certain things were (the men compared Joseph's driver's license to the mail in the house). When the men were about finished ransacking the house, they threw a blanket over Joseph's head and told him to count to 10,000 before going upstairs or else he would be shot. Joseph stayed in the basement with the blanket on him for approximately forty minutes, during which time he heard "furniture crashing" upstairs. *Id.* at 84. Eventually, Joseph heard the garage door go up and then his car starting and pulling out of the garage. After waiting a little while longer, Joseph emerged from underneath the blanket, untied his bindings, grabbed a pool cue, and headed upstairs. When he tried to open the door to the main floor, it would not open because the men had blocked it with a chair. Eventually, Joseph got the door opened, at which point he saw that the house was "shambolic." *Id.* at 86; *see also* Exs. 6-14. He also noticed that his wallet, cell phone, keys, and prescription medicines were missing. He went to the garage and confirmed that his car had been taken by the men. After confirming that the men had left, Joseph went to the house across the road and pounded on the door, but no one was home. The next

nearest neighbor was 1/4 mile down the road, so Joseph started walking in that direction. When Joseph spotted a car that wasn't the white SUV that the men had arrived in, he flagged down the car for help. The good samaritan called 911.

[7] Joseph's in-laws were contacted in Mexico, and they returned home on Sunday. They reported numerous items missing, including two televisions, two Xbox consoles, sound bars, games, movies, a watch, an entire jewelry box, a 9 mm Beretta, three long guns, $1100 in cash, and prescription drugs.

[8] A couple days after the burglary, Jordan contacted police and told them that Hoppes and White had taken his white SUV. Tr. Vol. II p. 123. On May 10, four days after the burglary, Kokomo police stopped the white SUV; Hoppes and White were inside. Upon searching the SUV, officers found the 9 mm Beretta that had been stolen from the in-laws' house on May 6. The officers spoke with Jordan, and he admitted to the May 6 burglary and identified everyone involved: himself, Kanable, Hoppes, and White. *Id.* at 190.

[9] On May 13, detectives with the Tippecanoe County Sheriff's Department spoke with Kanable in the Howard County Jail, where he was being held on an unrelated matter. During the videotaped interview, the detectives told Kanable that they had to read him his rights. After the detectives read Kanable his rights, he responded: "I'm just going to make this statement right now before I even sign it. I'm not answering any questions but I will listen to what you guys have to say." Appellant's App. Vol. II p. 128. Kanable signed the "Advice of

Rights" section of the form. *See* Ex. 27. The detectives then asked Kanable to sign the "Waiver of Rights" section of the form, to which Kanable responded:

> I'm not signing that. I'm not making any statements. Not without my lawyer. I, I'm not, I am not making any statements . . . I've had this . . . I've had that used against me before.

Appellant's App. Vol. II p. 129. One of the detectives then asked Kanable, "How so?" *Id.* After Kanable gave a vague answer, the detectives then told Kanable that they were going to send him back to his jail cell, and Kanable said, "I thought you, you guys wanted to talk to me." *Id.* The detectives told Kanable that they couldn't talk to him because he said he wanted to talk to his lawyer and that they would just talk to Kanable's lawyer. Kanable responded that he didn't have a lawyer yet, but he was "going to call a lawyer after this." *Id.* One of the detectives announced that it was time for him to get lunch (because "[i]t's freaking 12:30" and "I'm . . . fat") and told Kanable that if he "want[ed] to be a dic*" and not talk to them, he could. *Id.* at 130. Kanable immediately responded that he wasn't "trying to be a dic*" and that he would sign the form and listen to what they had to say. *Id.* After the detectives read to Kanable the "Waiver of Rights" section, which set forth that Kanable "d[id] not want a lawyer at this time," he signed it. Ex. 27. The detectives eventually told Kanable that they had a surveillance video from a gas station showing him get

out of Joseph's car "right after" the burglary on Friday night. Ex. 28R.[1] Kanable eventually admitted that it was him in the video (but claimed that he bought the car for $300), directed the detectives to where they could find the car, and admitted going to Lafayette on Friday with Jordan, Hoppes, and White (he said he told them "no guns" before going to Lafayette but that he later saw a gun). *Id.* Kanable never admitted his involvement in the crimes.

[10]  In June 2016, the State charged Kanable with several crimes relating to the May 6 incident:

- Count I: Level 2 felony conspiracy to commit burglary

- Count II: Level 2 felony burglary (breaking and entering the in-laws' home with the intent to commit theft, enhanced to a Level 2 felony because it was committed while armed with a deadly weapon)

- Count III: Level 3 felony conspiracy to commit robbery

- Count IV: Level 3 felony robbery (taking property from Joseph or his presence by using or threatening the use of force on Joseph or by putting Joseph in fear, enhanced to a Level 3 felony because it was committed while armed with a deadly weapon)

---

[1] Exhibit 28, the video of Kanable's interview with the detectives, was admitted into evidence at trial. Exhibit 28R, a redacted version of the interview, was played during the bench trial. Tr. Vol. II p. 196.

- Count V: Level 3 felony criminal confinement (confining Joseph without his consent, enhanced to a Level 3 felony because it was committed while armed with a deadly weapon)

- Count VI: Level 6 felony theft (exerting unauthorized control over televisions and/or other personal property of the in-laws with the intent to deprive them of any part of the value or use, enhanced to Level 6 felony because the value of the property was between $750 and $50,000)

- Count VII: Level 6 felony theft (exerting unauthorized control over the in-laws' firearms with the intent to deprive them of any part of the value or use, enhanced to a Level 6 felony because the property was a "firearm")

- Count VIII: Level 6 felony auto theft (exerting unauthorized control over Joseph's car with the intent to deprive Joseph of any part of its value or use)

- Count IX: Class A misdemeanor theft (exerting unauthorized control over Joseph's wallet, cell phone, keys, or other personal property with the intent to deprive him of any part of the value or use).

[11] The State also sought two sentencing enhancements, one pursuant to the habitual-offender statute and the other pursuant to Indiana Code section 35-50-2-11, which allows for the imposition of "an additional fixed term of imprisonment" on top of the base sentence for certain offenses (including Level

3 felony criminal confinement) if the defendant used a firearm in the commission of the offense. *See* Ind. Code § 35-50-1-2(f) ("If the factfinder determines under IC 35-50-2-11 that a person used a firearm in the commission of the offense for which the person was convicted, the term of imprisonment for the underlying offense and the additional term of imprisonment imposed under IC 35-50-2-11 must be served consecutively.").

[12]   The State also charged Jordan, Hoppes, and White with the same offenses (except for the habitual-offender enhancement). Each of them pled guilty to various offenses. A condition of their plea agreements required them to testify truthfully against Kanable at his trial.

[13]   In June 2017, Kanable filed a motion to suppress, arguing that the statements he made to the detectives after he told them that that he wasn't making any statements without his lawyer were inadmissible because they were obtained in violation of his Fifth Amendment right to counsel. Appellant's App. Vol. II pp. 97-98; Tr. Vol. II p. 7. A hearing was held, during which the trial court reviewed the video. The court denied Kanable's motion to suppress. Appellant's App. Vol. II p. 145.

[14]   A bench trial was held in November 2017. Kanable objected to the admission of the statements he made to the detectives after he invoked his right to counsel. Tr. Vol. II p. 196. Jordan, Hoppes, and White all generally testified that Kanable forced Joseph into the house at gunpoint, tied him up, and then took property from the house. *Id.* at 118-20 (Jordan), 145 (Hoppes), & 166 (White).

The court found Kanable guilty of Counts I-IX and determined that he used a firearm in the commission of the offense (but that he was not a habitual offender). The court stated that "even if [it] were not to include and consider the statement made [by] the defendant in his videotaped statement," it would still find him guilty of the charges. *Id.* at 212.

[15] At the sentencing hearing, the trial court discussed double jeopardy with the parties. *See* Tr. Vol. III pp. 8-20. Ultimately, the court found that Count II (burglary) merged into Count I (conspiracy to commit burglary) and sentenced Kanable to twenty-four years on Count I. Similarly, the court found that Count IV (robbery) merged into Count III (conspiracy to commit robbery) and sentenced Kanable to a concurrent term of eleven years on Count III. Next, the court sentenced Kanable to eleven years on Count V (criminal confinement) and then ordered this sentence to be served consecutive to an eight-year sentence for using a firearm in the commission of the offense.[2] The court then ordered these sentences, which totaled nineteen years, to run consecutive to the sentence on Count I. Finally, the court sentenced Kanable to two years on Count VI (theft), two years on Count VII (theft), two years on Count VIII (auto theft), and one year on Count IX (theft), to be served concurrent to each other and to the other sentences. Thus, Kanable's aggregate sentence is forty-three

---

[2] The trial court's Corrected Sentencing Order (but not the Abstract of Judgment) contains a discrepancy regarding what sentence is to run consecutive to Kanable's eight-year sentence for using a firearm in the commission of the offense, "Count III" or "Count V." *See* Appellant's App. Vol. II p. 18. On remand, the trial court must fix its sentencing order to reflect that "Count V" is to run consecutive to Kanable's eight-year sentence for using a firearm in the commission of the offense.

years. The court ordered Kanable to serve thirty-seven years in the Department of Correction, with the remaining six years suspended to probation.

Kanable now appeals.

# Discussion and Decision

## I. Invocation of Right to Counsel

Kanable contends that the statements he made to the detectives after he told them that he wasn't making any statements without his lawyer were obtained in violation of his Fifth Amendment right to counsel and that the trial court therefore erred in admitting them.[3]

The Fifth Amendment, which applies to the States by virtue of the Fourteenth Amendment, provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010). In *Miranda v. Arizona,* 384 U.S. 436 (1966), the United States Supreme Court adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the inherently compelling pressures of custodial interrogation. *Shatzer*, 559 U.S. at 103. To counteract the coercive pressure, *Miranda* announced that before questioning a suspect in custody, police officers must warn the suspect that he has a right to remain silent and a

---

[3] Although Kanable states that he invoked his right to remain silent, the cases he cites on appeal address the invocation of the right to counsel. Given our conclusion that any error in admitting Kanable's statements was harmless, we do not separately discuss the right to remain silent.

right to the presence of an attorney. *Id.* at 103-04. If the suspect states that he wants an attorney, the interrogation must cease until an attorney is present. *Id.* at 104. The accused is not subject to further interrogation until counsel has been made available to him, "'unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* In other words, an accused may waive his Fifth Amendment right after he has requested counsel, "provided the accused has initiated the conversation or discussions with the authorities." *Minnick v. Mississippi,* 498 U.S. 146, 156 (1990); *see also Hartman v. State*, 988 N.E.2d 785 (Ind. 2013).

[19] Here, there is a question as to whether Kanable initiated further communication with the detectives after he invoked his right to counsel by saying, "I thought you, you guys wanted to talk to me." However, even assuming that Kanable's Fifth Amendment right to counsel was violated, we find the error in admitting his statements to be harmless.

[20] Not every error in the admission of evidence requires a reversal. *Carr v. State*, 934 N.E.2d 1096, 1107 (Ind. 2010), *reh'g denied*. Before a federal constitutional error can be held harmless, "'the court must be able to declare a belief that it was harmless beyond a reasonable doubt.'" *Id.* (quoting *Chapman v. California,* 386 U.S. 18, 24 (1967)); *see also Durden v. State*, 99 N.E.3d 645, 652 n.6 (Ind. 2018) ("[A]n error of a federal-constitutional dimension . . . requires the State to prove beyond a reasonable doubt that the alleged error had no effect on the outcome of the case.").

[21] Here, we find that the State has proven beyond a reasonable doubt that Kanable's statements to the detectives after he invoked his right to counsel had no effect on the outcome of the case. First, although Joseph could not identify any of the men because his eyes were closed, his testimony established the facts of the crimes. Second, Kanable never admitted to the detectives during the interview that he was involved in the crimes. Third, although Kanable's statements indicated some type of involvement, it was the testimony of Jordan, Hoppes, and White that established Kanable as the mastermind behind the crimes as well as the principal actor in carrying them out. Finally, the trial court—the trier of fact in this case—stated that "even if [it] were not to include and consider the statement made [by] the defendant in his videotaped statement," it would still find him guilty of the charges. Tr. Vol. II p. 212. Accordingly, we find that any error in admitting Kanable's statements to the detectives after he invoked his right to counsel was harmless beyond a reasonable doubt.

## II. Propriety of Multiple Convictions

[22] Kanable next contends that there are problems with his multiple convictions for the May 6 incident. We agree that there are some problems and remand this case to the trial court with instructions to enter a new sentencing order and abstract of judgment.

[23] Kanable argues that he cannot be convicted of Level 2 felony conspiracy to commit burglary **and** Level 3 felony conspiracy to commit robbery because

there was only one agreement. The State acknowledges that "Indiana law holds that where there is a single agreement there can only be one conspiracy conviction." Appellee's Br. p. 32 (citing *Turnley v. State*, 725 N.E.2d 87 (Ind. 1990)); *see also Mftari v. State*, 537 N.E.2d 469, 475 (Ind. 1989) ("A single agreement to commit several unlawful acts cannot be punished by multiple convictions under a general conspiracy statute." (quotation omitted)). However, the State argues that this case "is not subject to this long-standing rule because there were multiple agreements here." Appellee's Br. p. 33. In support, the State claims that Kanable and the other men "had an agreement to commit robbery [by taking pills and guns] before going to the . . . home" and then once at the home they "agreed to burglarize the home for valuables." The record, however, does not support the existence of two separate agreements. Rather, the record shows that the men had an agreement to take items from a house while armed and that the men then took several items from the in-laws' house while holding Joseph at bay with a gun. There is no evidence that Kanable and the men entered into a **second** agreement once they entered the house. *Cf. Turnley*, 725 N.E.2d at 91. Accordingly, only one conspiracy conviction can stand. *See* Tr. Vol. III p. 12 (the State arguing at sentencing that there cannot be multiple conspiracy convictions).

[24] Anticipating this result, the State asks us to vacate Kanable's conviction for Level 3 felony conspiracy to commit robbery (Count III)—because it has less severe penal consequences than the other conspiracy conviction—and reinstate his conviction for Level 3 felony robbery (Count IV), which the court merged

into Count III. We agree and therefore order the trial court to vacate Kanable's conviction for Level 3 felony conspiracy to commit robbery, reinstate his conviction for Level 3 felony robbery, and impose a sentence of eleven years (the same sentence the court imposed on Count III).

[25] Doing this, however, creates an additional problem that apparently was not contemplated by the State. That is, theft is an inherently included lesser offense of robbery; one cannot commit robbery without also committing theft. *Johnson v. State*, 749 N.E.2d 1103, 1109 (Ind. 2001); *see also* Ind. Code § 35-38-1-6 ("Whenever (1) a defendant is charged with an offense and an included offense in separate counts; and (2) the defendant is found guilty of both counts; judgment and sentence may not be entered against the defendant for the included offense."). In addition, it does not matter that Kanable has four theft convictions. According to the single-larceny rule, when several articles of property are taken at the same time, from the same place, belonging to the same person or to several persons, there is only one offense. *Borum v. State*, 951 N.E.2d 619, 627 (Ind. Ct. App. 2011). The larceny complained of must be one single act or transaction, and the defendant must have a single intent when taking the property at issue. *Id.*; *see also Johnson*, 749 N.E.2d at 1110; *Stout v. State*, 479 N.E.2d 563, 568 (Ind. 1985). Accordingly, because there is only one theft in this case pursuant to the single-larceny rule and theft is an inherently included lesser offense of robbery, which we have reinstated, we order the trial court to vacate Kanable's four theft convictions, Counts VI, VII, VIII, and IX. Vacating the four theft convictions, however, will have no impact on Kanable's

sentence, as the trial court originally ordered these sentences to be served concurrent to each other and to the other sentences.

[26] These actions then leave the following convictions and sentences for Kanable:

- Count I: Level 2 felony conspiracy to commit burglary, twenty-four years[4]

- Count IV: Level 3 felony robbery, eleven years

---

[4] Kanable also argues that according to Indiana double-jeopardy principles, he can only be convicted of Level 2 felony conspiracy to commit burglary because the charging information for that count alleges numerous overt acts, including criminal confinement and robbery (which are his other convictions). In *Redman v. State*, 743 N.E.2d 263 (Ind. 2001), the defendant was charged with, among other things, conspiracy to commit murder and criminal confinement. For conspiracy, the State alleged four overt acts: abduction, confinement, rape, and disposing of the body. On appeal, the defendant argued that there was a reasonable possibility that the jury used the evidence of the victim's abduction in establishing both conspiracy to commit murder and criminal confinement. The Indiana Supreme Court said that if the jury found the defendant guilty of conspiracy to commit murder based upon the single overt act of the abduction, then "convictions for both . . . would have been based on the same evidence and thus would violate the Indiana Double Jeopardy Clause." *Id.* at 267. However, our Supreme Court said that was not the issue. Rather, "The issue . . . is not merely whether it is **possible** that this occurred, but rather whether the likelihood of this occurrence is sufficiently substantial for us to conclude that it is **reasonably** possible that this occurred." *Id.* The Court concluded that because the State's closing argument and the trial court's instructions to the jury referenced all four overt acts, "there is no reasonable possibility that the jury used the same evidentiary facts to establish the essential elements of both criminal confinement and conspiracy to commit murder." *Id.* at 268.

Although we do not have the benefit of closing argument and jury instructions in this case since it was a bench trial, there is a strong presumption that the judge acted correctly and followed the applicable law. *See Crider v. State*, 984 N.E.2d 618, 624 (Ind. 2013). Accordingly, because there were multiple overt acts alleged, we find no reasonable possibility that the evidentiary facts used by the trial judge to establish the essential elements of conspiracy to commit burglary were also used to establish the essential elements of robbery and criminal confinement.

- Count V: Level 3 felony criminal confinement, including the enhancement for using a firearm in the commission of the offense, nineteen years.[5]

Consistent with the trial court's original sentencing order, the sentences for Count I and Count V (including the sentencing enhancement) are consecutive to each other and concurrent to Count IV, resulting in the same aggregate sentence of forty-three years. On remand, the trial court must enter a new sentencing order and abstract of Judgment reflecting these convictions and sentences.

Affirmed in part and reversed and remanded in part.

Pyle, J., and Barnes, Sr. J., concur.

---

[5] Kanable suggests that he cannot be convicted of both criminal confinement and robbery because "the force element under robbery equals confinement." Appellant's Br. p. 31. Where the confinement of a victim is greater than that which is inherently necessary to rob them, the confinement, while part of the robbery, is a separate criminal transgression. *Hopkins v. State*, 759 N.E.2d 633, 639-40 (Ind. 2001) ("Defendant's removal of [the victims] to the basement and the confinement after robbing them were separate criminal transgressions from the robberies themselves."). Because Kanable's confinement of Joseph was greater than that necessary to rob him, he was properly convicted of both criminal confinement and robbery.