# FOR PUBLICATION



**FILED**

Aug 22 2012, 10:41 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**STEVEN KNECHT**
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**BRIAN REITZ**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| RYAN E. BEAN, ) | |
| ) | |
| Appellant-Defendant, ) | |
| ) | |
| vs. ) | No. 91A02-1109-CR-906 |
| ) | |
| STATE OF INDIANA, ) | |
| ) | |
| Appellee-Plaintiff. ) | |

APPEAL FROM THE CARROLL CIRCUIT COURT
The Honorable Donald E. Currie, Judge
Cause No. 08C01-1009-FA-2

APPEAL FROM THE WHITE SUPERIOR COURT
The Honorable Robert B. Mrzlack, Judge
Cause No. 91D01-1012-FA-157

**August 22, 2012**

**OPINION - FOR PUBLICATION**

**BARNES, Judge**

## Case Summary

In this consolidated appeal, Ryan Bean appeals his convictions for two counts of Class A felony child molesting. We reverse and remand.

## Issue

The dispositive issue we address is whether the two trial courts properly introduced into evidence Bean's confession to police.[1]

## Facts

On September 23, 2010, at about 2:30 p.m., detectives from Carroll and White Counties went to Bean's residence in Lafayette, wanting to speak with him about allegations made by his daughter, H.B., and his niece, M.S., that he had molested them in both counties. The detectives found Bean at home and told him that they were investigating possession of child pornography. Bean consented to a search of his computer and also agreed to accompany the detectives to the Lafayette Police Station to talk about the child pornography allegations and "something else . . . ." Suppression Tr. p. 38. An officer drove Bean to the station. He was not placed in handcuffs or told he was under arrest.

Bean was taken into a room at the station at 4:22 p.m., according to the time stamp on the video recording of his interrogation. Initially, Bean was asked basic identifying information. The discussion then moved to pornography that he had been downloading on his computer, including possible child pornography that Bean claimed he had not

---

[1] Given our resolution of this issue, we need not address Bean's argument regarding an unpreserved claim of improper vouching testimony and his claims of sentencing error.

intended to download.  At approximately 5:00 p.m., a detective made a point of showing Bean that the door to the room he was in was unlocked and that he could leave the building if he wanted to.  Bean then said, "Do I need a lawyer?"  App. p. 218.  The detective then informed Bean of his <u>Miranda</u> rights, showed him a waiver of rights form that listed those rights, and specifically pointed out to Bean, "you'll understand that somewhere in here it also says that you can stop talking to me anytime you want."  <u>Id.</u> at 219.  Bean signed the waiver of rights form at 5:10 p.m. and continued speaking with the detectives.

After continuing to discuss pornography, a detective told Bean he wanted to "switch gears a little bit" and talk about his daughter, H.B., namely that she had accused Bean of having molested her.  <u>Id.</u> at 236.  Bean professed to be shocked at this allegation and denied having had any sexual contact with H.B.  At approximately 5:50 p.m., after repeated denials of having molested H.B., the detectives told Bean they were leaving the room for a little while.  Bean said, "Can I leave yet?" and one of the detectives responded, "Well, if you want to leave—that's—you can leave at any time.  Is that—you understood—but we'd like to come back and talk to you for a second.  Okay?  All right."  <u>Id.</u> at 243.  Bean agreed to stay.

Very soon thereafter, one of the detectives returned to the room and began vigorously questioning Bean regarding allegations by his niece, M.S., that Bean had molested her.  The detective told Bean repeatedly that he believed M.S. had told the truth and asked Bean to be honest.  Bean continued denying any molestation occurred but did

3

admit that M.S. might have once accidentally seen him masturbating to internet pornography. Bean eventually began crying and said, after repeated questioning by the detective, "Ah, apparently I put my finger in her vagina." Id. at 262. Almost immediately thereafter, however, he said, "I'm making this up because I don't know." Id. at 263.

At 6:21 p.m., Bean said, "I mean the only thing else I can say is I want a lawyer so that way, you know, I don't have to worry about—you know—saying I don't know for the fifty-millionth time." Id. at 264. The detective initially sat in silence while Bean continued talking and crying without admitting that he molested either H.B. or M.S. After a few minutes, the detective said, "Well, Ryan, without knowing what you did because you're not telling me what you did—you made the comment—I want a lawyer. You know, do you want a lawyer or do you wanna tell me what you did so we know what help to get [M.S.]. I'm, I'm confused right now. You tell me." Id. A few minutes later, after repeated questioning by the detective as to whether he wanted a lawyer or to keep talking, Bean said, "And I told you—I, I want this to be done with." Id. at 265. Still, the detective continued asking Bean whether he truly wanted a lawyer or to "get it cleared up?" Id. Bean said, "I do wanna get it cleared up," by which he meant he wanted the detectives to believe his denials. Id. at 266. Again, the detective asked if Bean really wanted a lawyer, and Bean said, referring to the waiver of rights form, "I mean it says in there I can stop talking . . . ." Id. Bean repeatedly said he did not know if he wanted to continue talking, but he eventually did so with both detectives in the room.

Bean continued to deny for some time that he ever molested either H.B. or M.S. in the face of repeated aggressive questioning by one of the detectives. At one point Bean said, "And I need you guys to be honest with me. If I do say that I did all this kinda stuff, you gonna take me to jail?" Id. at 270. Neither of the detectives gave a straightforward response to this question, instead saying, "you knew that right after it happened, you knew that if somebody ever found out about it, there would be consequences. Right?" Id. at 271.

Finally, at approximately 7:00 p.m., Bean began confessing that he had molested H.B. He stated that on one occasion, he was masturbating while viewing internet pornography when she came downstairs and saw him, and he asked her to put her mouth on his penis. He also described a second occasion when he purportedly saw her masturbating, then decided to rub his penis on her bottom while he felt her vagina. Bean also eventually stated with respect to M.S. that on one occasion, he kissed her while she rubbed his penis and he rubbed her vagina. After writing a letter apologizing to H.S. (but not explicitly stating that he had molested her), Bean was arrested at approximately 9:30 p.m.

The State charged Bean in Carroll County with three counts of Class A felony child molesting of H.B. It also charged him in White County with one count of Class A felony child molesting and one count of Class C felony child molesting with respect to M.S. and one count of Class A felony child molesting of H.B. In White County, the trial court granted Bean's motion to sever the charges related to M.S. from the charge related

to H.B. In each of Bean's two jury trials regarding H.B., he filed motions to suppress his September 23, 2010, confession to police, which were denied by both trial courts. Bean renewed his objection to the confession at both trials. Bean was convicted in Carroll County of one count of Class A felony child molesting but acquitted of the other two counts, and he was convicted in White County of the one count of Class A felony child molesting related to H.B. Bean now appeals both convictions in this consolidated appeal. The outcome of Bean's trial regarding M.S., or even whether there was such a trial, is not before us.

## Analysis

Bean challenges the admission into evidence of his confession to police. Bean preserved his claim of error on this point through pretrial motions to suppress and trial objections. Our review of rulings for the admissibility of evidence is essentially the same regardless of whether the challenge is made through a pretrial motion to suppress or by trial objection. Jackson v. State, 890 N.E.2d 11, 15 (Ind. Ct. App. 2008). In either case, we will not reweigh the evidence and will consider conflicting evidence in a light most favorable to the trial court's ruling. Id. We must also, however, consider any undisputed evidence that is favorable to the defendant. Id. Furthermore, when a defendant preserves a claim of evidentiary error by contemporaneous trial objection,[2] we may consider foundational evidence introduced at trial in conjunction with any evidence from a suppression hearing that is not in direct conflict with the trial evidence. Kelley v. State,

_____

[2] A motion to suppress alone is insufficient to preserve a claim of error. Neukam v. State, 934 N.E.2d 198, 201 (Ind. Ct. App. 2010).

825 N.E.2d 420, 247 (Ind. Ct. App. 2005). In the present case, there is no conflict between the evidence presented at the motion to suppress hearings and the trial evidence regarding Bean's confession, and that evidence is undisputed as to what occurred.

Bean asserts that his confession should have been suppressed because it was obtained after he had invoked his Fifth Amendment right to counsel, as protected by Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966). The purpose of Miranda and the warnings it prescribes are to protect a suspect's Fifth Amendment privilege against self-incrimination "'by placing reasonable limitations on police interrogations.'" Hendricks v. State, 897 N.E.2d 1208, 1214 (Ind. Ct. App. 2008) (quoting Sauerherber v. State, 698 N.E.2d 796, 801 (Ind. 1998)). A person who is to be subjected to custodial interrogation by law enforcement must be informed, per Miranda, of the right to remain silent and to an attorney. State v. Hicks, 882 N.E.2d 238, 241 (Ind. Ct. App. 2008). If a person in custody unequivocally invokes his right to counsel, police must immediately and "'scrupulously'" honor that request and cease all further interrogation, unless the suspect initiates further communication with the police. Carr v. State, 934 N.E.2d 1096, 1106 (Ind. 2010) (quoting Miranda, 384 U.S. at 479, 86 S. Ct. at 1630). The requirements of Miranda apply only in the context of custodial interrogations "because they are meant to overcome the inherently coercive and police dominated atmosphere" of such interrogations. Collins v. State, 873 N.E.2d 149, 155 (Ind. Ct. App. 2007), trans. denied.

The State contends that even if Bean made an unequivocal request for counsel, a point it does not concede, the police were not required to honor that request because he was not in custody at the time he made the request. If a person is not in custody, police are not required to honor a request for counsel and cease questioning. Kelley, 825 N.E.2d at 430. To be "in custody," a suspect need not be placed under formal arrest. Morris v. State, 871 N.E.2d 1011, 1016 (Ind. Ct. App. 2007), trans. denied. "Rather, a person is in custody if a reasonable person under the same circumstances would have believed that he or she was under arrest or not free to resist the entreaties of the police." Id. We apply a totality of the circumstances test in determining whether a suspect was in custody, and "the mere fact that a person is not placed in handcuffs or otherwise physically restrained by the police does not necessarily mean a person is not in custody." Id. at 1018. Conversely, the fact that an interrogation takes place at a police station or other "coercive environment" does not necessarily mean the suspect is in custody. See Luna v. State, 788 N.E.2d 832, 834 (Ind. 2003).

The Seventh Circuit has compiled the following helpful list of factors commonly considered by courts in determining whether a person was in custody for purposes of Miranda: whether and to what extent the person has been made aware that he is free to refrain from answering questions; whether there has been prolonged, coercive, and accusatory questioning, or whether police have employed subterfuge in order to induce self-incrimination; the degree of police control over the environment in which the interrogation takes place, and in particular whether the suspect's freedom of movement is

8

physically restrained or otherwise significantly curtailed; and whether the suspect could reasonably believe that he has the right to interrupt prolonged questioning by leaving the scene. Sprosty v. Buchler, 79 F.3d 635, 641 (7th Cir. 1996), cert. denied. Ultimately, the question of custody is an objective test based upon how a reasonable person in the suspect's shoes would understand the situation and not upon the subjective views or beliefs of the interrogating officers and suspect. Loving v. State, 647 N.E.2d 1123, 1125 (Ind. 1995).

Another factor present in this case is that Bean was advised of his Miranda rights well before he confessed. We recognize that some courts have held that the reading of Miranda rights to a suspect has no impact on a determination of whether the suspect was in custody for purposes of invoking those rights. See, e.g., United States v. Charles, 738 F.2d 686, 693 n.6 (5th Cir. 1984) (holding that "the precaution of giving a suspect Miranda warnings in a noncustodial setting does not either transform that setting into, or 'help [] produce,' a custodial interrogation for Miranda purposes") (quoting United States v. Lewis, 556 F.2d 446, 449 (6th Cir. 1977), cert. denied), overruled on other grounds by United States v. Crawford, 52 F.3d 1303, 1307 n.4 (5th Cir. 1995). The Fourth Circuit has held that the reading of Miranda warnings does not "by itself create custody," because "[i]t would convert admirable precautionary measures on the part of officers into an investigatory obstruction." Davis v. Allsbrooks, 778 F.2d 168, 172 (4th Cir. 1985). However, the Davis court left open the possibility that there could be "circumstances

9

where a clash of wills over a suspect's desire to remain silent would create custody through overbearing police behavior." Id. at 172 n.1.

By contrast, the Seventh Circuit has said that "in the context of a prolonged detention where there is persistent, accusatory questioning by several officers, the fact that the police observed certain formalities of a custodial arrest," such as the reading of the Miranda warnings, "does provide some support for an inference that [a suspect is] in custody for purposes of Miranda." Sprosty, 79 F.3d at 642.[3] Similarly, the Tenth Circuit has held, "Although giving a Miranda warning does not, in and of itself, convert an otherwise non-custodial interview into a custodial interrogation, it is a factor to be considered by the court." United States v. Bautista, 145 F.3d 1140, 1148 (10th Cir. 1998), cert. denied. The Bautista court explained:

> If the authorities are free to tell a suspect that he has the right to appointed counsel, but could, while continuing to interrogate him, refuse to provide such counsel on the grounds that the suspect was not actually in custody, the suspect would be led to believe that no request for counsel would be honored. "The coercive effect of continued interrogation would thus be greatly increased because the suspect would believe that the police 'promises' to provide the suspect's constitutional rights were untrustworthy, and that the police would continue to violate those rights as they wished, regardless of assurances to the contrary." We do not suggest that a person can invoke his Miranda rights anticipatorily in any situation, i.e., in a context other than custodial interrogation . . . . However, law enforcement officers are not free to give the Miranda warning and then

---

[3] The Sprosty court held that the suspect was in fact in custody at the time of his interrogation by police, based in part (but not exclusively) on the fact that Miranda warnings had been read to him, but held there was insufficient evidence for habeas corpus purposes that the suspect had invoked his right to counsel. Sprosty, 79 F.3d at 643.

blatantly ignore a suspect's attempt to invoke any right thereunder.

Bautista, 145 F.3d at 1150-51 (quoting Tukes v. Dugger, 911 F.2d 508, 516 n.11 (11th Cir. 1990), cert. denied).

We find ourselves in agreement with the view of the Seventh, Tenth, and Eleventh Circuits. That is, we would agree that although the giving of Miranda warnings should not automatically render a suspect "in custody," neither should the giving of such warnings be irrelevant in that analysis. In fact, it is unclear to us what purpose the reading of Miranda rights to a suspect should serve, if police did not intend to honor an invocation of those rights. One such possible purpose would be to encourage a suspect to incriminate him- or herself by providing a false sense of security that such rights existed, only to have the rug pulled out from underneath them when an attempt to invoke those rights is ignored.[4] This would turn Miranda on its head and potentially eviscerate its core purpose of ameliorating the coercive nature of a police dominated atmosphere. See Collins, 873 N.E.2d at 155. Moreover, it is unclear what a suspect could be told, after he or she had already been read the Miranda warnings in the context of an adversarial interrogation in a police-dominated atmosphere but police ignored an earlier invocation of those rights. We strongly suspect that a re-reading of those warnings in such a

---

[4] It is unclear to us that the meaningless giving of Miranda warnings when police will not honor an invocation of rights is an "admirable precautionary measure[]," as stated by the Fourth Circuit. We are not sure "precautionary" is the correct or apt word.

11

situation, once a suspect was "truly" in custody, would be largely ineffective to protect the suspect's Fifth Amendment rights.

In Luna, our supreme court addressed a scenario in which a suspect drove himself to a police station at an officer's request to discuss molestation allegations that had been made against him. The suspect was told that he did not have to talk to the police, that he was not under arrest, and that he was free to leave at any time. Within about one hour's time, the suspect admitted to molesting the child and was then permitted to leave the station. On appeal, a majority of this court reversed the defendant's molestation conviction, holding he was "in custody" when he confessed and erroneously was not informed of his Miranda rights before he did so. Luna v. State, No. 79A02-0201-CR-33 (Ind. Ct. App. Sept. 17, 2002). Our supreme court granted transfer and affirmed the conviction, stating, "a person who goes voluntarily for a police interview, receives assurances that he is not under arrest, and leaves after the interview is complete has not been taken into 'custody' by virtue of an energetic interrogation so as to necessitate Miranda warnings." Luna, 788 N.E.2d at 834 (citing Oregon v. Mathiason, 429 U.S. 492, 97 S. Ct. 711 (1977)). The Luna court also quoted from the dissent of the author of this opinion: "'I believe the proof is in the pudding here,'" meaning the police had kept their word that the defendant would be free to leave after making his statement. Id. at 833 (quoting Luna, No. 79A02-0201-CR-33, slip op. at 8 (Barnes, J., dissenting)). See also Faris v. State, 901 N.E.2d 1123, 1126-27 (Ind. Ct. App. 2009) (holding mentally disabled suspect was not in custody where he voluntarily went to police station with mother, total

12

interview lasted approximately two hours, and he was allowed to go home after confessing to molesting his daughter), trans. denied.

By contrast, we held that a child battery suspect in Morris was in custody when she finally made a confession and improperly was not advised of her Miranda rights. The suspect voluntarily went to the police station to give a statement regarding the death of a child she had been babysitting. She was initially informed that she was not under arrest, had no obligation to be there, and could leave at any time. She first was interviewed by one officer, denied any wrongdoing, and asked to leave. While she was starting to walk home and still in the police station parking lot, a different officer approached her and asked her to talk some more, and she agreed. After again denying wrongdoing, the suspect went to the police station lobby to wait for two other people to complete their interviews on the same topic. While waiting, a third officer approached the suspect and asked her to talk some more, and she agreed. During this third interview, conducted about four to five hours after first arriving at the station, the suspect confessed to having battered the child. It was only after this confession that the suspect was read her Miranda rights. We held that as of the third interview, the suspect was effectively in custody because "a reasonable person in [the suspect's] position would not have felt free to resist the entreaties of the police at that time." Morris, 871 N.E.2d at 1018.

This case falls in between Luna and Morris on the "in custody" spectrum. After considering all the facts and circumstances of this case, we conclude Bean was in custody when he finally confessed to having molested H.B., even if he was not formally arrested

13

at that time and even if he had technically been told he was free to leave the station at any time and to not talk to police.

First, neither Bean nor an acquaintance of his drove him to the station—a police officer did. By itself, this does not establish that Bean was in custody, but it would have complicated his efforts to leave the station if he did not want to continue talking to police. This is unlike the situation in <u>Luna</u>, where the suspect appears to have agreed to transport himself to the police station at a pre-agreed time and was able to transport himself away from the station thereafter.

Second, the officers who spoke to Bean at his residence did not tell him the real reason they wanted to speak with him. Instead, they led him to believe he was under investigation for child pornography. Although that is a serious crime, it was only after Bean had been at the station for about an hour and a half that he was told of the real reason for the interrogation—an accusation by his daughter and niece that he had molested them. Such accusations were dramatically more serious than what he was led to believe would be discussed at the station and substantially changed the tenor of the interrogation. Such a "bait and switch" would most probably lead a reasonable person to feel much less likely to be permitted to simply walk out of the police station.

Third, the questioning in this case was clearly aggressive and fairly lengthy. Bean repeatedly denied molesting either H.B. or M.S., but the officers continued insisting that children would not make up molestation allegations. By the time Bean finally confessed, he had been at the station for nearly two-and-a-half hours and been subjected to

14

questioning regarding criminal activity for approximately two hours. We also note that at one point, Bean asked if he could leave and one of the detectives responded, "Well, if you want to leave—that's—you can leave at any time. Is that—you understood—but we'd like to come back and talk to you for a second. Okay? All right." App. p. 243. This might not have compelled Bean to stay, but on the other hand it strongly encouraged him to do so.

Fourth, we note that unlike cases such as Luna and Faris, Bean in fact was not allowed to return home after he finally confessed. At one point before he confessed Bean tried to ask if he would be allowed to go home if he told the officers what they apparently wanted to hear, and they failed to provide a direct answer to that question. A reasonable person in Bean's situation at that point might have felt he or she was in a "Catch-22": to either continue denying wrongdoing indefinitely, with police refusing to accept those denials, or to confess and face immediate arrest. Thus, there was no "proof in the pudding" here—instead, he was arrested after having given his statement.

We need not decide whether these factors alone would have been enough to render Bean in custody at the time of his confession. The crucial factor here that leads us to believe that Bean was in custody when he finally confessed is that he had been advised of the Miranda rights to remain silent and to an attorney, that he had invoked those rights, and that police continued questioning him anyway. Indeed, this case differs from Luna, Morris, and many others in that the question in those cases was whether the suspect

15

should have been advised of their <u>Miranda</u> rights; Bean, by contrast, was advised of those rights and tried to invoke them, albeit unsuccessfully.

After considering the totality of the circumstances, including but not limited to police informing Bean of the <u>Miranda</u> rights, we conclude that Bean was in custody when he finally gave his confession because a reasonable person would not have felt free to leave the police station at that point. The facts here are even more indicative of custody than those of <u>Ackerman v. State</u>, 774 N.E.2d 970, 979 (Ind. Ct. App. 2002), <u>trans. denied</u>, where we found a suspect to be in custody where she was "transported from home with no obvious means of returning, had admitted possible illegal activity to police, and then finally was advised of her <u>Miranda</u> rights . . . ."[5] At the time of Bean's confession, he was in custody but had either (a) not been <u>meaningfully</u> informed of his <u>Miranda</u> rights or (b) had earlier invoked those rights.

The State also argues that even if Bean was in custody when he confessed, he had not unambiguously invoked his right to counsel. An accused's request for counsel must be unambiguous and unequivocal. <u>Anderson v. State</u>, 961 N.E.2d 19, 26 (Ind. Ct. App. 2012), <u>trans. denied</u>. Cessation of police questioning is not required if a suspect's reference to an attorney is ambiguous or equivocal, such that a reasonable officer in light of the circumstances would have understood only that the suspect <u>might</u> be invoking the right to counsel. <u>Id.</u> Invocation of the <u>Miranda</u> right to counsel requires, at a minimum,

---

[5] <u>Ackerman</u> addressed whether a suspect was in custody for purposes of advising her of her right to counsel before consenting to a search under <u>Pirtle v. State</u>, 236 Ind. 16, 323 N.E.2d 634 (1975). This court has noted that the same "custody" analysis applies to <u>Pirtle</u> questions as it does to <u>Miranda</u> issues. <u>Morris</u>, 871 N.E.2d at 1017-18.

16

some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney. Id. The request must be made with sufficient clarity such that a "reasonable police officer under the circumstances would understand the statement as a request for an attorney." Id.

In Anderson, we found the invocation of the right to counsel unequivocal where the defendant said, "I really would like to talk to an attorney or something," and his right to counsel should therefore have been "'scrupulously honored.'" Id. (quoting Miranda, 384 U.S. at 479, 86 S. Ct. at 1630). Bean's statement in the case before us was equally unequivocal: Bean said, "I want a lawyer so that way, you know, I don't have to worry about–you know–saying I don't know for the fifty-millionth time." App. p. 264. Questioning should have ceased at this point.

Additionally, the State asserts that Bean reinitiated conversation with the police after saying he wanted an attorney. Once a suspect invokes the right to counsel, further interrogation is allowed only when it is shown that the accused initiated further discussions and knowingly and intelligently waived the right to counsel he or she had earlier invoked. Smith v. Illinois, 469 U.S. 91, 95, 105 S. Ct. 490, 493 (1984). Bean did continue speaking after saying "I want a lawyer." However, these statements were rambling and made while Bean was crying. Contrary to the State's assertion, Bean made no confession in these statements. Rather than cease further communications with Bean, the detective instead repeatedly attempted to prod Bean into either confessing or "clarifying" whether he really wanted counsel. These "persistent resumptions of

17

communication after the defendant's invocation of rights" were improper. See Carr, 934 N.E.2d at 1107. Moreover, after the detective made several attempts to "clarify" whether Bean wanted a lawyer, Bean stated, "And I told you—I, I want this to be done with. . . . Over." App. p. 265. In combination with Bean's earlier unequivocal invocation of his right to counsel, this unequivocal invocation of his right to silence should have been honored. But it was not. As such, we conclude that Bean's ultimate confession was obtained in violation of Miranda and should have been suppressed.

The State further argues that even if the trial courts erred in admitting Bean's confession, any such errors were harmless. A federal constitutional error in the admission of evidence may be harmless, but only if it can be deemed harmless beyond a reasonable doubt. Carr, 934 N.E.2d at 1107. It is not enough that there might be sufficient evidence of guilt without the erroneously admitted evidence; its admission must be harmless beyond a reasonable doubt. Koenig v. State, 933 N.E.2d 1271, 1272 (Ind. 2010). To be harmless, the erroneously admitted evidence must be unimportant in relation to everything else considered by a jury on the issue in question. Anderson, 961 N.E.2d at 28.

We cannot reach that conclusion here. Aside from the confession, there was no evidence to support Bean's convictions aside from H.B.'s testimony, which was vague in parts and lacked detail. It simply is impossible to say that a jury would not have considered Bean's confession to be important in either trial. We note, moreover, that the Carroll County jury acquitted Bean of two of the molestation charges against him.

18

Bean's confession related one act of molestation against H.B. in Carroll County while H.B.'s testimony alleged several acts. We, therefore, reverse both of Bean's molestation convictions. Because there is no claim of insufficient evidence to support those convictions, he may be retried. See Carr, 934 N.E.2d at 1109.

## Conclusion

Bean's confession was obtained in violation of Miranda protocol and should not have been admitted into evidence in either trial. Those errors were not harmless and must result in reversal of his molestation convictions in Carroll and White Counties. We reverse and remand for retrials, if the State so chooses.

Reversed and remanded.

FRIEDLANDER, J., and MAY, J., concur.