**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**WILLIAM BYER, JR.**
Byer & Byer
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RYAN D. JOHANNINGSMEIER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DANIEL TORRES, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 48A05-1305-CR-267 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MADISON CIRCUIT COURT
The Honorable Dennis D. Carroll, Judge
Cause No. 48C06-1206-FC-1177

**April 17, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Defendant, Daniel C. Torres (Torres), appeals his conviction of sexual misconduct with a minor, a Class C felony, Ind. Code § 35-42-4-9(b)(1).

We affirm.

## ISSUE

Torres raises one issue on appeal, which we restate as: Whether the trial court committed reversible error by denying Torres' motion to suppress his video-recorded interview with the police.

## FACTS AND PROCEDURAL HISTORY

Torres was born in Mexico and moved to the United States when he was twenty-five years old. Most of Torres' family, including an estranged wife and two children, still live in Mexico. Torres attended school through the seventh grade in Mexico, and a few years after moving to the United States, he completed a class to learn English as a second language. Although Torres is proficient at understanding English, he has some difficulty speaking it. Prior to his arrest, Torres lived in Anderson, Indiana with his girlfriend of seven years, Koren Reed (Reed), their son, and Reed's son from a previous relationship.

On the afternoon of June 23, 2012, thirty-seven-year-old Torres and Reed hosted a cookout at their home to celebrate Reed's birthday. Reed's fifteen-year-old niece, P.B., attended the cookout, as did P.B.'s mother (Reed's sister) and P.B.'s older cousin, M.R. (also Reed's niece). Later that evening, P.B.'s mother drove Torres and Reed to a nearby restaurant before returning to her own home in Chesterfield, Indiana. P.B. and M.R.

2

remained at Torres and Reed's house to babysit the children and had planned to spend the night. When Torres and Reed walked home from the restaurant, P.B. and M.R. were in the living room watching a movie and playing with the children. Torres and Reed sat down in the kitchen, drank a few beers, and eventually retired to their bedroom. P.B. and M.R. fell asleep on the living room couches.

Shortly before 3:00 a.m., P.B. was awakened by the feeling of Torres' "penis touch[ing] my vaginal area." (Transcript p. 160). P.B. observed Torres leaning over her with his boxer shorts pulled down around his knees. When P.B. stirred, Torres pulled his underwear back up, and P.B. realized that her own shorts had been pulled down to expose her private parts. P.B. pulled her shorts up, and Torres sat down beside her on the couch. As P.B. repeatedly asked Torres to "please stop[,]" he instructed her to remain quiet. (Tr. p. 162). Torres moved to the end of the couch and began rubbing P.B.'s leg before he stood and attempted to kiss her. P.B. turned her head, causing Torres to kiss her cheek. At this point, Torres returned to the bedroom where Reed was still asleep.

P.B., still lying on the couch, sent her boyfriend a text message asking him to call her. With her boyfriend listening on the other end of the phone, P.B. stated that she felt safe enough to move from the couch, and she locked herself in the bathroom. There, she told her boyfriend that she was "really scared" because Torres had "tried to rape her." (Tr. p. 188). While on the phone with her boyfriend, P.B. returned to the living room and shook M.R. to wake her up. M.R. followed P.B. to the bathroom, where P.B. called her mother and explained the situation. P.B.'s mother immediately called the police to report the

3

incident and drove back to Anderson. When they heard a vehicle pull into the driveway, P.B. and M.R. exited the bathroom and went outside to meet the police officers.

Torres was escorted to the Anderson Police Department for questioning. Before Detective Michael Lee (Detective Lee) began the video-recorded interview, Officer Caleb McKnight (Officer McKnight), who is fluent in Spanish, administered a *Miranda* warning. Reading verbatim from a pre-printed Spanish *Miranda* form, Officer McKnight advised Torres of his rights to remain silent and to have counsel present. Then, still speaking Spanish, Officer McKnight summarized the contents of the form he had just read and explained to Torres that, upon Torres' request, they could call the Mexican Consulate. Torres signed the waiver of rights form to indicate that he understood his rights and that he agreed to voluntarily speak to the police without the presence of an attorney. Initially, Torres ardently denied P.B.'s allegations. He repeatedly claimed that he was very drunk and had taken a pain pill before he went to bed and that he had no memory of doing anything to P.B. As Detective Lee pressed for more information, Torres eventually admitted that he had gone into the living room, moved P.B.'s blanket aside, pulled down his boxer shorts, sat beside her on the couch, and, with his hand, touched her over the top of her shorts.

Later that day, June 24, 2012, the State filed an Information charging Torres with one Count of sexual misconduct with a minor, a Class C felony.[1] On April 9 through April

---

[1] The State initially charged Torres pursuant to Indiana Code section 35-42-4-9(a). However, on the first day of the trial, it was discovered that the State had listed the incorrect statutory subsection. By agreement of the parties and with permission of the trial court, before the jury was sworn in on April 10, 2013, the State amended the Information to add Count II, sexual misconduct with a minor, a Class C felony, I.C. § 35-42-4-9(b), and immediately thereafter dismissed Count I.

12, 2013, a jury trial was conducted. In the midst of the trial, Torres moved to suppress the statements he made to the police, contending that he was not properly advised of his *Miranda* rights. The trial court held a suppression hearing outside of the jury's presence and, determining that Torres had been adequately advised of his rights, admitted the police interview into evidence over Torres' objection. At the close of the evidence, the jury returned a verdict of guilty. On May 7, 2013, the trial court held a sentencing hearing and imposed a term of six years, fully executed in the Indiana Department of Correction.

Torres now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. *Standard of Review*

We review a trial court's denial of a motion to suppress under a standard similar to that used in a sufficiency of the evidence case. *Morales v. State*, 749 N.E.2d 1260, 1265 (Ind. Ct. App. 2001). We do not reweigh evidence or assess witness credibility, and we will construe all conflicting evidence in a light most favorable to the trial court's ruling. *Id.* In contrast to sufficiency matters, however, we will consider any uncontested evidence in the defendant's favor. *Id.*

II. *Violation of Miranda Rights*

Torres claims that the trial court erred in admitting the recording of his police interview. Specifically, Torres contends that his incriminating statements should have been suppressed because he neither received an adequate warning nor knowingly and voluntarily waived his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). *Miranda* warnings serve "to protect a suspect's Fifth Amendment privilege against self-incrimination 'by

5

placing reasonable limitations on police interrogations.'" *Bean v. State*, 973 N.E.2d 35, 40 (Ind. Ct. App. 2012) (quoting *Sauerheber v. State*, 698 N.E.2d 796, 801 (Ind. 1998)), *trans. denied*. Accordingly, *Miranda* instructs that, prior to a custodial interrogation, law enforcement must apprise the suspect of his right to remain silent and to an attorney. *Id.* A defendant waives his *Miranda* rights when he, "after being advised of those rights and acknowledging that he understands them, proceeds to make a statement without taking advantage of those rights." *Ringo v. State*, 736 N.E.2d 1209, 1211-12 (Ind. 2000).

The State bears the burden of proving that Torres "voluntarily and intelligently waived his constitutional rights and that his confession was voluntarily given." *Carter v. State*, 730 N.E.2d 155, 157 (Ind. 2000). The admissibility of a confession is a matter within the sound discretion of the trial court, and we will uphold the trial court's ruling absent an abuse of that discretion. *Id.* On review, we must determine whether "there is substantial evidence of probative value from which the trial court could reasonably have concluded beyond a reasonable doubt that the statements and waiver of rights were freely and voluntarily made." *Santana v. State*, 679 N.E.2d 1355, 1357 (Ind. Ct. App. 1997). We consider the totality of the circumstances in determining whether a defendant has voluntarily waived his rights. *Ringo*, 736 N.E.2d at 1212. Although not dispositive, a signed waiver form is evidence that a suspect understood and voluntarily waived his rights. *Id.*

A. *Adequacy of Miranda Warning*

Torres concedes that he acknowledged his understanding of his rights to Officer McKnight. However, he contends that Officer McKnight's Spanish advisement was

6

defective, thus rendering Torres' confession inadmissible. The evidence on record demonstrates that Officer McKnight orally advised Torres of his rights by reading directly from the police department's pre-printed Spanish form. Despite Torres' ability to comprehend English, his rights were given solely in Spanish. During the suppression hearing, Officer McKnight provided the trial court with an English translation of the rights that he read to Torres in Spanish:

> You have the right . . . before you answer any questions . . . and it's necessary that you understand your rights. Anything that you say . . . everything you explained can be used in the [c]ourt, criminal court. You can speak with your lawyer before you answer any questions. If you don't have any money to pay a lawyer . . . the State of Indiana can provide services for a lawyer . . . if you say so. If you would like to answer these questions . . . or your declaration with the lawyer present. You have the right to answer the questions. [] You still have the right to stop during the questioning. In whatever moment you would like. And you have a right to speak with a lawyer.

(Tr. pp. 335-40 (ellipsis in original)). Officer McKnight testified that, because there are "several ways to say different things" in Spanish, he also summarized the rights to ensure Torres understood that "[i]f you do not want to speak to us without a lawyer that's okay." (Tr. pp. 355, 391). The record reflects that as Officer McKnight read the rights aloud, Torres occasionally acknowledged, "Uh-huh[,]" and when Officer McKnight asked Torres if he understood his rights, Torres answered, in English, "Yes." (Tr. pp. 336, 392). Based upon Officer McKnight's translation, the parties agree that the rights advisement would have been adequate. However, Torres argues that Officer McKnight's English interpretation during the suppression hearing does not accurately translate what he stated to Torres in Spanish prior to the interview.

7

To assist Torres during the trial, the trial court appointed David P. Wilson (Translator), an attorney, to act as an interpreter. During the suppression hearing, the trial court solicited the opinion of Translator, who agreed that Officer McKnight read the Spanish rights form verbatim. However, Translator explained that, in addition to numerous grammatical and vocabulary errors, the Spanish rights form failed to inform Torres that any statements "*can and will* be used against him in court." *See Santana*, 679 N.E.2d at 1358. Instead, Translator stated that Torres had been advised that his statements to the police could "be used against the [c]ourt." (Tr. p. 385). Thus, according to Torres, the warning fails to substantially comply with *Miranda* because it must "be emphatically communicated to a person that if he speaks that there will be consequences of what he speaks and those consequences are that . . . anything to his detriment . . . can and will be used against him in a [c]ourt of law." (Tr. p. 375). In ruling that the recorded police interview was admissible, the trial court explained that it would be "quite a stretch" to objectively find that an individual

> who has lived here all these years and, and who speaks and at least understands both English and Spanish and has told us he understands [us,] . . . having had the form read to him and then having the informal conversation[,] . . . did not understand his essential *Miranda* Rights and did not waive them.

(Tr. pp. 395-96 (Italics added)).

On appeal, Torres maintains that the language was inadequate because "[b]eing instructed that his answers to the questions[] would be used against the court[] demonstrates that he could not have understood the implications." (Appellant's Br. p. 8). Our supreme court has stated that *Miranda* requires

8

meaningful advice to the unlettered and unlearned in language which he can comprehend and on which he can knowingly act. We will not indulge semantical debates between counsel over the particular words used to inform an individual of his rights. The crucial test is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all of his rights.

*Jones v. State*, 252 N.E.2d 572, 576 (Ind. 1969). It is well-established that it is the role of the trial "court to objectively determine whether in the circumstances of the case the words used were sufficient to convey the required warning." *Id.*

Torres' challenge stems from a dispute as to the correct English translation of the Spanish *Miranda* form. The Translator testified during the suppression hearing that Officer McKnight's advisement suggested that Torres' statements could be used *against the court*, but the Translator also filed an affidavit with the trial court in which he translated the Spanish rights form into its literal word-for-word English equivalent. In this version, Translator understands the form to state: "You have the Right . . . [o]f to remain silent, whatever thing that you may say, to implicate[2] yourself against the court criminal." (Appellant's App. p. 83 (footnote added)). Notwithstanding the interpreters' inconsistences as to this one phrase, the evidence establishes that it was otherwise made explicitly clear to Torres that he could maintain his silence; that he did not have to speak with the police officers without a lawyer present; that it was the State's obligation to provide a lawyer if he so chose; and that even if he opted to speak, he could stop talking at

---

[2] Translator notes that the form says "empleca" but this "word does not exist in Spanish." (Appellant's App. pp. 84-85). "I think it is meant to be 'implica', which used as 'se implica' means to implicate yourself." (Appellant's App. p. 84). Because Officer McKnight read Torres' rights aloud rather than just instructing Torres to read the document to himself, we focus our attention on the form's substance, not its editing quality.

any time. From this, it seems apparent that a reasonable person would understand these warnings as affording the suspect an opportunity to protect himself—not the court—from making incriminating statements.

Although Torres has only a seventh grade education, he has lived in Indiana for more than twelve years and clearly understands English. During his police interview, Torres did not hesitate to inform Detective Lee in English when he did not understand a question, but at no point did Torres communicate any confusion regarding Officer McKnight's Spanish advisement. Furthermore Torres' criminal record is indicative of his familiarity with the criminal justice process. While it may be well-advised for the Anderson Police Department to have its Spanish rights form reviewed for imperfections, considering the totality of the circumstances of the case at hand, we agree with the trial court that the form's language was "sufficiently clear" to put Torres on notice that anything he said to the police could later implicate him in court. *Allen v. State*, 686 N.E.2d 760, 770 (Ind. 1997), *habeas corpus granted on other grounds*, *Allen v. Wilson*, No. 1:01-cv-1658-JDT-TAB, 2012 WL 2577492, at *15 (S.D. Ind. July 3, 2012).

## B. *Voluntary Waiver*

Torres also claims that his acknowledgement that he understood his rights did not amount to a knowing and voluntary decision to waive those rights. *See Morales*, 749 N.E.2d at 1266-67. During the suppression hearing, Torres raised only one objection to the adequacy of Officer McKnight's warning based on whether the language informed Torres that any statements could be used against him or used against the court. To the extent that Torres now contends that his statements were involuntarily made because "he

10

was improperly advised verbally of those rights," we have already determined that the language was sufficient to inform him of his rights. (Appellant's Reply Br. p. 2). We also find that Torres has waived any additional arguments, including that Officer McKnight failed to read the portion of the form where Torres declared that he was voluntarily choosing to forego his rights, on appeal. "A defendant is limited to the grounds advanced at trial and may not raise a new ground for objection for the first time on appeal." *King v. State*, 799 N.E.2d 42, 49 (Ind. Ct. App. 2003), *trans. denied*; *cert. denied*, 543 U.S. 817 (2004).

Waiver notwithstanding, we find that Torres voluntarily waived his *Miranda* rights and voluntarily confessed. Torres may have complaints about the quality of Officer McKnight's Spanish, but a confession is considered voluntary where it "is the product of a rational intellect." *Ringo*, 736 N.E.2d at 1212. Here, Torres received both oral and written warnings, acknowledged that he understood his right to refrain from speaking to the police, signed the waiver, and chose to participate in the police interview without the presence of counsel. *See Allen*, 686 N.E.2d at 772-73. At trial, Torres claimed that he only "repeat[ed] what [Detective Lee] had already told [him]" because he wanted to end the interview. (Tr. p. 489). However, Torres does not argue, and the evidence does not establish, that he was induced to speak by "violence, threats, promises, or improper influence." *Carter*, 730 N.E.2d at 157. Accordingly, we conclude that Torres understood his rights and voluntarily chose to waive them.

### III. *Harmless Error*

Even if we had determined that Torres' statements were made and admitted in violation of *Miranda*, we would nevertheless uphold the trial court's admissibility determination under a harmless error analysis. "The improper admission of evidence is harmless error when the conviction is supported by substantial independent evidence of guilt which satisfies the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction." *Morales*, 794 N.E.2d at 1267. We review a federal constitutional error *de novo,* and any error "must be 'harmless beyond a reasonable doubt.'" *Id.* (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

In this case, omitting Torres' inculpatory statements from evidence, we find that the jury's verdict is "supported by substantial independent evidence of guilt." *Id.* P.B. testified that Torres touched her vaginal area with his penis. *See Bell v. State*, 497 N.E.2d 556, 556-57 (Ind. 1986) (finding sufficient evidence to uphold conviction based solely on victim's "understandable and generally consistent" testimony). Additionally, M.R. and P.B.'s boyfriend and mother all testified as to the details of P.B.'s emotional state and response to Torres' behavior, which were consistent with P.B.'s account. Finally, although there was no DNA evidence found on P.B. or her clothing, the blanket that P.B. had been using that night—and which Reed claimed to have washed only a day or two prior to P.B.'s use— was found to contain Torres' DNA.[3] Using differential extraction, the crime lab analyst testified that the DNA on the blanket derived from Torres' seminal fluid. Therefore, we

---

[3] We note that the blanket also contained the DNA of an unidentified individual (*i.e.*, neither Torres nor P.B.), which *may* support Torres' testimony that his DNA was excreted onto the blanket on a prior occasion and never washed away. However, the jury was aware of the existence of the additional DNA profile when it determined Torres' guilt, and it is not the role of our court to re-weigh the evidence.

conclude that any error would be harmless as Torres' statements were merely cumulative of other evidence from which the jury had an independent basis for returning a guilty verdict.

## CONCLUSION

Based on the foregoing, we conclude that the trial court did not abuse its discretion in denying Torres' motion to suppress and admitting the recorded police interview because Torres was adequately advised of his *Miranda* rights and voluntarily waived them.

Affirmed.

VAIDIK, J. and MAY, J. concur