## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 15 2018, 5:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

John Quirk
Quirk & Hunter, P.C.
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Antone L. Harris,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | October 15, 2018<br><br>Court of Appeals Case No.<br>18A-CR-906<br><br>Appeal from the Delaware Circuit Court<br><br>The Honorable Kimberly S. Dowling, Judge<br><br>Trial Court Cause No.<br>18C02-1602-F5-23 |

**Mathias, Judge.**

[1] Following a jury trial in Delaware Circuit Court, Antone L. Harris ("Harris") was convicted of Level 5 felony child seduction. Harris appeals and presents

four issues for our review, one of which we find dispositive: whether the trial court abused its discretion in admitting evidence of Harris's statement to the police that was obtained after he requested counsel, a request that was ignored. Concluding that the evidence of the interrogation should have been excluded, we reverse and remand for retrial.[1]

## Facts and Procedural History

In early 2016, Harris lived in Muncie, Indiana with his wife A.T., and her two children: Harris's sixteen-year-old stepdaughter L.W., and Harris's three-year-old son A.H. On January 25, 2016, L.W. came home from school around 4:00 p.m. and went to her mother's and stepfather's bedroom to watch television.[2]

When L.W. entered the bedroom, she saw Harris and A.H. sitting on the bed. L.W. lay down on the bed and fell asleep. But later she "woke up to a strange feeling. [Harris] was getting closer to [her]." Tr. Vol. II, p. 112. L.W. "felt something on the side of [her] body," which she identified as Harris's erect penis. *Id*. Harris got closer to L.W., who did not say anything "because [she] felt uncomfortable." *Id*. As Harris got closer to L.W., he climbed on top of her and removed her pants and underwear. Harris then "insert[ed] his penis into [L.W.]." *Id*. at 114. Harris did not say anything to L.W., and she did not say anything to him because she was "scared" and "didn't know what to say." *Id*.

---

[1] Because we reverse and remand for retrial, we need not address Harris's other claims.

[2] The family did not have cable television, so it was typical for L.W. to watch movies or play video games in this bedroom on a video-gaming system.

Harris had sexual intercourse with her for several minutes, until he ejaculated onto her stomach. This made her feel "disgusting." *Id*. at 115. Harris then asked L.W. if she loved him.

After this, L.W. got out of the bed and took a shower. When L.W.'s mother came home, she noticed that L.W. "had a look on her face that [she] knew that wasn't right," and therefore asked L.W. what was wrong. *Id*. at 152. L.W. replied, "nothing," because she "didn't feel comfortable telling [her] mom. [She] was scared. [She] didn't know how to tell her." *Id*. at 117.

The following day, L.W. told her school principal what Harris had done to her, and the principal called the police. When L.W.'s mother and Harris arrived at the school, police officers were there and arrested Harris. That same day, Harris was taken to the Criminal Investigation Division at Muncie City Hall and was interviewed by Sergeant Jessie Winningham of the Muncie Police Department ("Sgt. Winningham"). At the beginning of the interview, Harris signed a waiver of his *Miranda* rights. But when Sgt. Winningham asked him to consent to a buccal swab to collect DNA, Harris stated that he would "rather have an attorney" because he did not "know what's going on." Ex. Vol., State's Ex. 1 at 16:05. Sgt. Winningham told Harris that, by signing the consent form, he was not admitting to guilt, and Harris reluctantly signed the form. Sgt. Winningham then acknowledged that Harris had said that he would like to have an attorney, and Harris told him that he did not understand what he had signed and again stated, "I want to have an attorney." *Id*. at 17:30. Instead of ceasing questioning, Winningham told Harris that he had to investigate the allegations.

Before he could leave the room, Harris asked Sgt. Winningham what he had signed, and Sgt. Winningham tried to explain to him the content of the consent forms. Harris stated again, "I'd rather have an attorney advise me." *Id.* at 18:20. Sgt. Winningham asked Harris if he wanted a particular attorney, to which Harris replied in the negative. Sgt. Winningham then left the room.

[6] Approximately two minutes later, Sgt. Winningham returned to the interview room and told Harris that L.W. was giving a statement and undergoing a rape kit test. He further told Harris that there were "two sides to the story," and told Harris that he was just going to "state some facts" to which Harris did not have to reply. *Id.* at 21:04. The following exchange then occurred:

> Winningham:   She's going to say one thing. Just think about this, what happens if we find a DNA match, because you're already in the system. Listen real quick. She's sixteen years old. You saying that she's coming on, doing whatever she's doing. You know, I understand that stuff. I get that stuff. Dude, we're human. But again, there's a difference between somebody accusing somebody of raping, and somebody having consensual [sex]. So just think about this real quick, okay, because obviously there's something. Something's going on here. And we'd rather get out ahead of this now and figure out the true side of this than go back. If you got an attorney that you want to talk to, you get with them and talk to me about this. Cause I'm telling you what. It's going to come back and bite you on the ass if we find your DNA in her.

> Harris:          Man, My DNA shouldn't be in her.

> Winningham:   It shouldn't.

Harris:          No.

Winningham:    I'm just saying. Now, how's that going to look for us? Whose side of the story are we going to believe on this when this happens.

Harris:          I ain't, I didn't have sex with her.

Winningham:    Alright. Well then, again I don't know why you're worried.

Harris:          I'm not worried.

* * *

Winningham:    Unfortunately, we have to do both sides of the investigation. And again, with you being in prison in the past, your DNA is already in the system. All we have to do is send hers off for comparison, once we get the, once we get the sexual assault kit back, and if you pop in there, you're, it's going to be completely different than if we sat here and was just truthful about, man, this is what happened.

Harris:          I didn't have sex with her. You're tripping man.

Winningham:    Okay, I'm just letting you know.

Harris:          I don't have to worry about that shit, man.

Winningham:    Cause how is it, look at it from my perspective

Harris:          It ain't going to look like nothing, cause I didn't have sex with her.

Winningham:   Alright. Then I don't know what you're worried about.

Harris:          Straight up. That's the bottom line.

Winningham:   I'm just, I'm just telling you.

Harris:          I understand you're doing your job.

Winningham:   I'm doing my job.

* * *

Winningham:   I know there's always two sides to these stories.

Harris:          Exactly.

Winningham:   And I got a feeling there's more to it.

Harris:          Only side of my story is, I ain't having sex with her.

Winningham:   Alright.

Harris:          And the second side of my story is, when was I supposed to have sex with her.

Winningham:   Alright. Well hey, okay.

Harris:          That's what I want to know. I mean, when was I supposed to have sex with her?

Winningham:   Hey, I can't go into, I can't go into any more detail

Harris:          It's crazy, I mean, I don't even.

Winningham:   Listen, listen. You've requested an attorney, I can't ask you any questions. I'm just telling you where we're at with it, OK?

Harris:          I mean, you can, I told you, you can ask me questions. I don't mind you asking me questions. But I don't like giving up my blood, or giving up my whatever until, I want to know what the f**k is going on...

Winningham:   But you have asked for an attorney. Do you want an attorney at this time? I'll come back in here and sit and talk to you about it. But I have to, you have to tell me if you want an attorney at this time. If not, we're done. Okay. If you do want an attorney. I can't go in to, talk to you anymore.

Harris:          No, I want to talk to you, man.

Winningham:   Alright, well give me a second, and I'll be right back in, okay.

*Id*. at 21:14–24:39.

[7]    Sgt. Winningham then continued to interrogate Harris, who initially kept denying that he had any sexual contact with L.W., but eventually claimed that

L.W. initiated the sexual contact with him by grabbing his penis while he was asleep. He also claimed that he never intentionally inserted his penis in to L.W. but that it could have happened while she was on top of him. He also admitted that he ejaculated during this incident, but he insisted that he did not rape L.W.

[8] Despite his repeated requests, Harris was never provided with an attorney, nor did the interview cease. Instead, after making his statement, Harris was arrested and taken to jail, and an attorney was not appointed to represent Harris until his initial hearing on February 4, 2016.

[9] While Harris was in jail, the police procured a search warrant authorizing them to obtain a DNA sample from Harris by taking a buccal swab. When the police executed this warrant on January 28, 2016, Harris requested to speak with Sgt. Winningham again. Harris was therefore taken to the interrogation room, where he spoke for a second time with Sgt. Winningham.

[10] Before this second interview, Sgt. Winningham confirmed that Harris had requested to speak with him, which Harris confirmed. Sgt. Winningham also re-read Harris his *Miranda* rights, and Harris signed another waiver of these rights. During this second interrogation, Harris stated that he felt L.W. get close to him in the bed and awoke when he felt her touch his penis. He claimed to have fallen back asleep and thought he was dreaming that someone was giving him oral sex. Harris claimed that, when he awoke, L.W. was manipulating his penis and that he ejaculated.

[11] On February 2, 2016, the State charged Harris with one count of Level 5 felony child seduction. As noted above, the trial court appointed a public defender to represent Harris on February 4, 2016. Harris's counsel subsequently filed a motion to suppress Harris's statements to the police. At the suppression hearing held on February 2, 2017, Harris argued that the evidence elicited during his interviews should be suppressed because Sgt. Winningham had not honored Harris's request for counsel during the first interview. The State conceded that the evidence from the first interview should be suppressed but argued that the evidence from the second interview should not be suppressed because Harris initiated the second interview, Sgt. Winningham advised Harris of his *Miranda* rights prior to this interview, and Harris waived these rights. The trial court agreed with the State and suppressed the evidence from the first interview, but not the second.

[12] A two-day jury trial commenced on February 26, 2017. Harris testified that he had made up the entire story about L.W. initiating sexual contact with him during his statement to Sgt. Winningham, and he denied that anything inappropriate had ever occurred between him and L.W. The jury found Harris guilty as charged. On March 22, 2017, the trial court sentenced Harris to six years of incarceration. Harris now appeals.

## Standard of Review

[13] Decisions regarding the admission of evidence are generally entrusted to the sound discretion of the trial court and are therefore reviewed on appeal only for an abuse of that discretion. *Harrison v. State*, 32 N.E.3d 240, 250 (Ind. Ct. App.

2015), *trans. denied*. The trial court abuses its discretion only if its decision regarding the admission of evidence is clearly against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law. *Id.*

# Discussion and Decision

Harris argues that evidence regarding his second statement to the police should have been excluded because the second interview was a logical extension of the first interview, evidence of which the trial court did exclude, and because the second interview contained multiple references to the statements Harris made in the first interview. The State counters that the second interview was properly admitted because it was Harris who initiated the second interview and because Harris was readvised of his *Miranda* rights prior to this second interview and agreed to waive these rights.

The Self-Incrimination Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. This constitutional safeguard is applicable to the several states via the Fourteenth Amendment. *Bleeke v. Lemmon*, 6 N.E.3d 907, 925 (Ind. 2014) (citing *Withrow v. Williams*, 507 U.S. 680, 688–89 (1993)).[3] In *Miranda v. Arizona*, 384 U.S. 436,

---

[3] We note that Article 1, Section 14 of the Indiana Constitution also provides individuals with a similar right to be free from self-incrimination. Harris, however, does not make any cognizable argument under the Indiana Constitution. For this reason, we do not discuss Article 1, Section 14 and focus our analysis solely on the Fifth Amendment. *See Haviland v. State*, 677 N.E.2d 509, 513 n.2 (Ind. 1997).

469 (1966), the United States Supreme Court held that, to protect this right against self-incrimination, a suspect must be informed of the right to remain silent and the right to have counsel present during a custodial interrogation. The *Miranda* Court further held that when an "individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning." *Id.* at 474. Accordingly, if a person in custody unequivocally invokes his right to counsel, police must immediately and "scrupulously honor" that request and cease all further interrogation, unless the suspect initiates further communication with the police. *Bean v. State*, 973 N.E.2d 35, 40 (Ind. Ct. App. 2012) (citing *Miranda*, 384 U.S. at 479), *trans. denied*. Although police stations are not required to "have a 'station house lawyer' present at all times to advise prisoners[,]" law enforcement must cease questioning an individual until he has the opportunity to consult with counsel. *Miranda*, 384 U.S. at 474.

[16]     Even if the accused initially elects to waive his rights, such waiver may later be rescinded at any time, and "[i]f the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease." *Carr v. State*, 934 N.E.2d 1096, 1102 (Ind. 2010) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 387–88 (2010)). Where the police continue to question an individual after he has indicated he wants an attorney, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently

waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475.

[17] If, however, the accused on his own "initiates further communication, exchanges, or conversations" with law enforcement, then the accused may be questioned further without counsel present. *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). Subsequent cases from the Court "have interpreted [*Edwards*] to mean that the authorities may not initiate questioning of the accused in counsel's absence." *Minnick v. Mississippi*, 498 U.S. 146, 152 (1990).

[18] The initiation of further communication by an accused, standing alone, is not sufficient to establish a waiver of the previously asserted right to counsel. *Osborne v. State*, 754 N.E.2d 916, 922 (Ind. 2001) (citing *Grimm v. State*, 556 N.E.2d 1327, 1330 (Ind. 1990)). If the accused did initiate further communication, then the subsequent inquiry is whether there is a valid waiver of the right to counsel, i.e., whether the purported waiver was knowing and intelligent under the totality of the circumstances. *Id.* "[E]ven if a conversation . . . is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983).

[19] Here, even though Harris did initiate further communication with the investigating detective, we are unable to say that the subsequent events indicate a valid waiver of the right to counsel under the totality of the circumstances.

Importantly, Harris's decision on this matter must be viewed in light of what happened during his first interview, during which he repeatedly asked for an attorney, yet one was not provided for him; nor did questioning immediately cease. Instead, the interrogation continued. Where a suspect's previous request for counsel has been unproductive, the suspect has no reason to believe that another request for counsel will be honored. *Hartman v. State*, 988 N.E.2d 785, 789 (Ind. 2013).[4] Not only did the questioning not cease, as it must under *Miranda* and *Edwards*, Harris was never provided counsel at any time during his interrogation. In fact, he was not provided with counsel until ten days after he first requested counsel. Moreover, as noted by Harris, the content of the second interview contained references to Harris's statements in the first interview.[5] The State admits that evidence from the first interview was inadmissible due to the

---

[4] In *Hartman*, when the defendant requested counsel, the interrogating officer ceased questioning. *Id.* at 787. But the officers later initiated what amounted to interrogation at a later time. *See id.* at 790 (concluding that defendant's inquiry to officers was in direct response to the officers' questions rather than an independent initiation of the conversation by the defendant). Here, although the record supports the trial court's finding that Harris initiated the second round of questioning, his first request for counsel did not, as in *Hartman*, result in the cessation of questioning.

[5] Most of these references consist of Sgt. Winningham countering Harris's statements by referring to what Harris had already told him, i.e., what Harris stated in the first interview. We refer to the redacted version of State's Ex. 2, which does not contain a timestamp. Therefore, all citations to this exhibit refer to the run time of the redacted interview, not the actual time the interview took place. *See, e.g.*, Ex. Vol., State's Ex. 2 at 1:12:03 (Harris and Winningham arguing over whether Harris admitted to ejaculating onto L.W.'s stomach and whether Harris made hand gestures mimicking L.W.'s alleged behavior); *Id.* at 1:14:14 (Winningham confronting Harris with his prior statement from first interview that Harris masturbated and ejaculated); *Id.* at 1:14:56 (Winningham informing Harris that he previously told him that L.W. was on top of Harris and his penis went into her vagina and arguing with him that he already admitted that this happened); *Id.* at 1:16:36 (Winningham again informing Harris that he had already admitted that he ejaculated on L.W.)

continued questioning after Harris's request for counsel. Thus, even though it occurred several days later, the second interview referred to the first.[6]

[20] Under these facts and circumstances, we conclude that Harris's waiver of his *Miranda* rights during the second interview was not valid. Accordingly, Harris's statements during this interview should also have been excluded, and the trial court erred in admitting evidence of these statements.

[21] We further conclude that the admission of Harris's statements was not harmless. To the contrary, Harris's inculpatory statements were quite damning, and we cannot say that they had no probable impact on the jury. *See Mendoza-Vargas v. State*, 974 N.E.2d 590, 597 (Ind. Ct. App. 2012) (noting that errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of the party and that to determine whether an error in the introduction of evidence affected the appellant's substantial rights, we assess the probable impact of that evidence upon the jury). We must therefore reverse Harris's conviction based upon the improper admission of his second interview with the police.

---

[6] The State faults Harris for not previously objecting to any insufficient redaction of the recording of his second interview prior to trial. We are aware of no requirement that a defendant review the State's evidence prior to trial and object thereto in order to preserve an evidentiary issue for appeal. To the contrary, Harris was required by Indiana Evidence Rule 103(a) to make a timely objection. *See also Brittain v. State*, 68 N.E.3d 611, 618 (Ind. Ct. App. 2017) (noting that a contemporaneous objection at the time the evidence is introduced at trial is required to preserve the issue for appeal), *trans. denied* (citing *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010)).

When deciding whether retrial is permissible, we consider all of the admitted evidence, including any improperly admitted evidence, to determine if the evidence viewed as a whole would have been sufficient to sustain the verdict; if so, prohibitions against double jeopardy do not bar retrial. *Gaby v. State*, 949 N.E.2d 870, 882 (Ind. Ct. App. 2011). Here, there was ample evidence to support Harris's conviction, namely, the properly admitted testimony of L.W., in addition to the improperly admitted evidence of Harris's statements. Accordingly, we reverse and remand for retrial at which Harris's statements made during his second interview with Sgt. Winningham are excluded.

## Conclusion

Under the facts and circumstances present in this case, we can only conclude that the trial court abused its discretion in admitting evidence of Harris's incriminating statements during the second interview. Nor was the admission of such incriminating statements harmless. Accordingly, we must reverse Harris's conviction. But because there was sufficient evidence to support Harris's conviction, retrial is proper. We therefore remand for retrial at which the statements Harris made during the second interview shall be excluded.

Reversed and remanded.

Bailey, J., and Bradford, J., concur.