## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 20 2019, 8:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kurt A. Young
Nashville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jordan Phillip Taber, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | December 20, 2019 <br><br> Court of Appeals Case No. 19A-CR-903 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Sheila A. Carlisle, Judge <br><br> Trial Court Cause No. 49G03-1708-MR-29848 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Jordan Taber (Taber), appeals his conviction for murder, a felony, Ind. Code § 35-42-1-1(1).

We affirm.

# ISSUE

Taber presents this court with two issues on appeal, which we consolidate and restate as the following single issue: Whether the trial court abused its discretion in admitting into evidence his statement to the police.

# FACTS AND PROCEDURAL HISTORY

In the late hours of June 3, 2017, Raeshawn Lawrence (Lawrence), Brandan Key (Key), Evenbay Settles (Settles), and Fairly Griffie (Griffie), were smoking marijuana and drinking alcohol. All four men were in a vehicle being driven by Key. First, the group went to a party in Avon, Indiana, and left after about thirty minutes. Then, at the suggestion of Griffie, Key drove them to a birthday party at Carriage House Apartments in Indianapolis, Indiana. They arrived between 11:00 p.m. and midnight.

After about twenty minutes, a group of three men arrived at the birthday party. One of the men, who had short hair, was Johnny Talley (Talley), and the other, who had a long "fuzzy ponytail," was Taber. (Transcript Vol. II, p. 102). According to Lawrence, Talley had a "gun on his waist," and, moments after

arriving at the party, Talley "aggressively" approached Griffie for "a couple of seconds," but they eventually "just shook hands." (Tr. Vol. II, pp. 101, 104). At some point during the party, Lawrence heard Talley state, "Let's squash this." (Tr. Vol. II, p. 108).

[6] After spending about an hour at the birthday party, Lawrence, Key, Settles, and Griffie decided to leave. When they got to Key's vehicle, Griffie did not get inside; instead, he turned around and walked away. After about thirty seconds, multiple gunshots were fired. Key backed the car out of the parking space and drove toward Griffie. Settles and Lawrence exited the vehicle and found Griffie lying on the ground with multiple gunshot injuries to his chest. Lawrence observed Griffie's gun resting on the ground next to Griffie. As Settles and Lawrence tried to place Griffie inside the vehicle, Lawrence saw Taber come around the corner of an apartment building, and Taber began shooting toward Key's vehicle. Lawrence and Settles ducked and got inside Key's vehicle, and Key drove to a different location in the apartment complex. In the meantime, Taber walked toward Griffie and took Griffie's gun. Lawrence observed Taber's actions. Moments later, Lawrence saw a "blue sports car" speed away "[v]ery fast." (Tr. Vol. II, p. 112). Lawrence, Settles, and Key returned to where Griffie was and called 9-1-1.

[7] At around 1:30 a.m. on June 4, 2017, Officer Scott Highland (Officer Highland) of the Speedway Police Department was dispatched to the scene. Upon arriving, Officer Highland found Griffie lying on the ground, and Griffie had

several bullet holes through his shirt. Using scissors from his first aid kit, he cut Griffie's shirt and applied gauze to Griffie's chest wounds. Griffie struggled to breathe, was unable to talk, and he eventually died on the scene.

[8] At around 1:57 a.m., Detective Erika Jones (Detective Jones) and other detectives of the Indianapolis Metropolitan Police Department arrived at the scene. Detective Jones encountered Lawrence and Key, and she transported them to the homicide office to obtain their taped statements. After conducting the interviews, Detective Jones received information from Griffie's mother that Griffie had "been having a beef" with a man named "Johnny." (Tr. Vol. III, p. 59). Griffie's mother also provided Detective Jones with a screen shot of Johnny's Facebook profile. Johnny's Facebook profile name was "James Slaughter," and upon further research, Detective Jones discovered that Johnny/James Slaughter was Talley, an associate of Taber. (Tr. Vol. III, p. 59). Also, while looking through Talley's Facebook photos and list of friends, Detective Jones was looking for the shooter, who might have had "long stringy hair" pulled back in a ponytail. (Tr. Vol. III, p. 62). Detective Jones found a photo of a man that matched the description she was looking for and the profile name for the man displayed on Facebook was "Julio Hernandez." (Tr. Vol. III, p. 62). Upon cross-referencing Julio Hernandez's date of birth as listed on Facebook with BMV records, Detective Jones discovered that Julio Hernandez was Taber. Following her research, Detective Jones assembled separate photo arrays which included Taber and Talley.

[9]     A few hours after the shooting, Detective Jones talked to Lawrence and showed him the photo arrays. Lawrence, who had seen Taber shooting at the scene, stated, "[t]hat's the dude." (Tr. Vol. II, p. 12). Lawrence proceeded to circle and sign his name beside Taber's photo. Detective Jones also showed the photo arrays to Key. Key was unable to recognize Taber from the lineup, but he recognized Talley. Settles recognized Taber in one of the photo arrays, but since he was "going through a lot" at the time, he did not want his "name on any paperwork." (Tr. Vol. II, p. 198).

[10]    On June 6, 2017, Detective Jones telephoned Talley and asked if he would be willing to speak with her at the homicide office in Indianapolis. Talley accepted the invitation, and he informed Detective Jones that he would be accompanied by his attorney. Detective Jones called Talley's attorney to confirm Talley's story. Talley's attorney indicated that it was true he was accompanying Talley and that they were on their way. Talley's attorney added that Taber was accompanying them since Taber wanted to speak with Detective Jones. Talley's attorney indicated that he was only representing Talley and not Taber.

[11]    When Talley, Talley's attorney, and Taber arrived at the homicide office, Detective Jones and her partner, Detective Gray Smith (Detective Smith), directed Talley and his attorney to the conference room. Since "there was not a section for anyone to just kind of sit and wait," Taber was ushered into an interview room. (Tr. Vol. II, p. 14). For about an hour, Detective Jones

questioned Talley. In the course of the interview, Talley asserted that during the shooting, he saw Griffie pull a "gun out on [] Taber" and fire "a shot." (Tr. Vol. II, p. 15).

[12] After completing Talley's interview, Detectives Jones and Smith entered the interview room where Taber was waiting and introduced themselves. Detective Jones then read Taber his *Miranda* warnings. Taber stated that he had a GED and understood English, and when he was asked to sign the waiver form, Taber stated that he "wanted to have a lawyer" present. (Tr. Vol. II, p. 16). Detectives Jones and Smith terminated the interview and began packing up. Taber, however, stated that he wanted to "give a statement, but he [did] not want all the trick questions." (Tr. Vol. II, p. 17). Detective Jones explained to Taber that since he had invoked the right to have an attorney present, she could not question him further. Taber then asked Detective Jones if he "had to stay [] there" or "he had to wait until he had an attorney." (Tr. Vol. II, p. 17). Detective Jones informed Taber that he "was not free to leave." (Tr. Vol. II, p. 17). At that moment, Taber changed his mind and stated that "he wanted to give a statement [] without an attorney." (Tr. Vol. II, p. 18). Detectives Jones and Smith left the room, and Detective Jones intended to consult the prosecutor as to whether she would be permitted to question Taber since he had waived his right to counsel.

[13] While Detectives Jones and Smith were out of the room, on two occasions Taber stood up and knocked on the door to get the detectives' attention. As

soon as Detectives Jones and Smith reentered the interview room, Taber pointed at the seat Detective Jones had recently vacated and stated unequivocally that he wanted to give a statement. Detective Jones again read Taber his *Miranda* warnings. Taber stated that he understood his rights, and he signed a waiver. During a two-and-a-half-hour interview, Taber admitted that at some point during the shooting, he "pulled out a gun and then [] closed [his] eyes and then [] just got to shooting." (State's Exh. Vol. I, p. 40). Given that there was more than one gun fired, and pending the results of a forensic firearm examination, Taber was permitted to leave after the interview. The results of the forensic examination were released in July 2017, and Taber was arrested.

[14] On August 15, 2017, the State filed an Information, charging Taber with Count I, murder, a felony, and Count II, unlawful possession of a firearm by an SVF, a Level 4 felony. On February 14, 2019, Taber filed a motion to suppress the statement he gave to Detectives Jones and Smith. The trial court conducted a hearing on March 6, 2019 but denied Taber's motion. A bifurcated jury trial was held on March 18 through March 20, 2019. During the first phase, the jury found Taber guilty of murder, and there was no need for a second phase since the State moved to dismiss the Level 4 felony unlawful possession of a firearm by an SVF charge. On March 27, 2019, the trial court conducted a sentencing hearing and sentenced Taber to sixty years in the Department of Correction.

[15] Taber now appeals. Additional information will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Admission of the Evidence*

When ruling on the admissibility of evidence, the trial court is afforded broad discretion, and we will only reverse the ruling upon a showing of abuse of discretion. *Gibson v. State*, 733 N.E.2d 945, 951 (Ind. Ct. App. 2000). An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Id.* We consider the evidence most favorable to the trial court's ruling and any uncontradicted evidence to the contrary to determine whether there is sufficient evidence to support the ruling. *Id.*

Taber first contends that he was unlawfully detained, which was a violation of his rights under the Fourth Amendment of the United States Constitution. As such, Taber contends that the trial court abused its discretion by admitting his statement to Detectives Jones and Smith. Further, Taber claims that his Fifth Amendment rights under the United States Constitution were violated when Detectives Jones and Smith continued questioning him even after he had demanded an attorney.

## II. *Fourth Amendment Violation*

Taber argues that shortly after he arrived at the homicide office, he was held in a locked interrogation room, and Detective Jones subsequently informed him he was not free to leave. Taber contends that the statement he offered thereafter

"was a direct result of that illegal detention," and his Fourth Amendment rights under the United States Constitution were violated. (Appellant's Br. p. 21). In response, the State argues that because Detective Jones had probable cause to detain Taber, his Fourth Amendment rights were not violated.

[19] The Fourth Amendment of the United States Constitution declares "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *Krise v. State*, 746 N.E.2d 957, 961 (Ind. 2001). The Fourth Amendment's prohibition on unreasonable searches and seizures applies not only to searches and seizures of property, but also to physical apprehension of persons, such as arrests. *Roberts v. State*, 599 N.E.2d 595, 598 (Ind. 1992). In general, police must have a warrant to make an arrest. *Thomas v. State*, 81 N.E.3d 621, 625 (Ind. 2017). An officer may, however, arrest a suspect without a warrant if he observes the suspect committing a crime, or if the officer has probable cause to believe that the suspect has committed a felony. *Sears*, 668 N.E.2d at 666-67.

[20] "Probable cause to arrest arises when, at the time of the arrest, the arresting officer has knowledge of facts and circumstances, which would warrant a person of reasonable caution to believe that the defendant committed the criminal act in question." *Id*. at 626 (citing *Sears*, 668 N.E.2d at 667). The amount of evidence necessary to satisfy the probable cause requirement for a warrantless arrest is evaluated on a case-by-case basis. *Id*. Rather than requiring "a precise mathematical computation, probable cause is grounded in

notions of common sense." *Id*. (citing *Ogle v. State*, 698 N.E.2d 1146, 1148 (Ind. 1998)). "A police officer's subjective belief as to whether he has probable cause to arrest a defendant has no legal effect. Instead, the police officer's actual knowledge of objective facts and circumstances is determinative." *State v. Parrott*, 69 N.E.3d 535, 543 (Ind. Ct. App. 2017), *trans. denied*. "The ultimate determination of probable cause is reviewed *de novo*." *Id*.

[21] Contesting the existence of probable cause, Taber claims that at the time Detective Jones interviewed him, there was no "warrant for [his] arrest and no charges had been filed against him." (Appellant's Br. p. 21). Thus, Taber contends that his "statement was a direct result of [an] illegal detention." (Appellant's Br. p. 21).

[22] As to whether Detective Jones and other officers had probable cause to lawfully detain Taber in the interview room, the record reveals that prior to Taber's voluntary visit to the homicide office, Detective Jones had questioned Lawrence regarding the shooting. Lawrence stated that Taber had fired several shots at Griffie and toward Key's vehicle. Lawrence had also stated that he had seen Griffie with a gun at the birthday party, and after Griffie had been shot, he saw Taber take Griffie's gun which was lying on the ground next to Griffie. Additionally, from the photo arrays prepared by Detective Jones, Lawrence identified Taber as one of the people who fired shots on the day Griffie was shot. Based on Lawrence's statement, Detective Jones determined that Taber was not free to leave since he was the lead suspect in the homicide. Also,

Detective Jones believed that Taber could have been charged with "theft from stealing [Griffie's] firearm, possibly robbery, possibly criminal recklessness for firing the gun at the back of [Key's] vehicle." (Tr. Vol. II, p. 18).

[23] Under the facts and circumstances of this case, a person of reasonable caution in Detective Jones' position could have concluded that Taber had committed several felony offenses, thus, we cannot hold that Taber's detainment at the homicide office violated Taber's Fourth Amendment rights under the United States Constitution. Thus, we hold that his statement was admissible, and the trial court did not abuse its discretion.

### III. *Fifth Amendment Violation*

[24] Taber further contends that his questioning was improper because it continued after he requested to have counsel present. Taber, therefore, asserts that his confession was not freely and voluntarily given and that his Fifth Amendment rights under the United States Constitution were violated.

[25] It is undisputed that Taber was in custody when Detective Jones informed Taber that he was not free to leave the interview room. When a person is questioned by law enforcement officers after being taken into custody, that person must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Once

the accused requests counsel, "the interrogation must cease until an attorney is present." *Carr v. State*, 934 N.E.2d 1096, 1102 (Ind. 2010) (citing *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981)). Future interrogation is allowed only when it is shown by a preponderance of the evidence that the accused initiated further discussions and knowingly and intelligently waived the right to counsel he had earlier invoked. *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984).

[26] In the present case, Taber was willingly present at the homicide office. Detective Jones testified that since "there was not a section for anyone to just kind of sit and wait," Taber was taken to an interview room. (Tr. Vol. II, p. 14). When Detectives Jones and Smith concluded their interview with Talley, they entered the room where Taber was waiting. Detective Jones immediately read Taber his *Miranda* warnings and asked Taber to sign the waiver of rights form. Taber invoked his right to an attorney. Detectives Jones and Smith terminated the interview and proceeded to exit the room. At that moment, Taber changed his mind and stated that "he wanted to give a statement [] without an attorney." (Tr. Vol. II, p. 18). Detective Jones ultimately left the room to consult the prosecutor as to whether she would be permitted to question Taber since he had waived his right to counsel. A short while later, Taber reinitiated communication with the detectives by knocking on the door. When Detective Jones reentered the interview room, she asked Taber what his knock meant, and Taber explicitly stated that he wanted to give a statement

without an attorney. Detective Jones again read Taber his *Miranda* warnings and asked whether he understood them. Taber answered affirmatively and signed the waiver. Detective Jones then proceeded with the interrogation, and Taber made an incriminating statement.

[27] While Taber had unequivocally invoked his right to counsel at the initial encounter, he knowingly and intelligently waived that right by reinitiating conversation with Detective Jones. Because Taber initiated further communication, Taber voluntarily chose to forego his right to counsel. Detective Jones readvised Taber of his *Miranda* rights. Taber said he understood, and he then made an incriminating statement. These facts strongly suggest that Taber issued a voluntary statement, and we conclude that the trial court did not abuse its discretion by admitting Taber's statement.

# CONCLUSION

[28] Based on the foregoing, we conclude that Taber's Fourth and Fifth Amendment rights under the United States Constitution were not violated, and the trial court did not abuse its discretion by admitting Taber's statement.

[29] Affirmed.

[30] Baker, J. and Brown, J. concur